**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AMERICAN GREAT LAKES PORTS
ASSOCIATION
700 12th Street, NW, Suite 700
Washington, DC 20005,

BROCHART KB
Trappvagen 5
Sollentuna, 191 35 Sweden,

CANFORNAV INC.
800 Rene-Levesque Blvd West, Suite 2300
Montreal, Quebec H3B 1X9 Canada,

FEDNAV INTERNATIONAL LTD.                     Civil Action No. 1:16-cv-1019
1000 de La Gauchetière Street West, Suite 3500
 Montreal, Quebec  H3B 4W5 Canada,

POLSKA ZEGLUGA MORSKA P.P.
Plac Rodła 8
70-419 Szczecin, Poland,

SHIPPING FEDERATION OF CANADA
300 St. Sacrement Street, Suite 326
Montreal, Quebec H2Y 1X4 Canada,

SPLIETHOFF TRANSPORT BV
Radarweg 36
1042 AA Amsterdam, The Netherlands,

UNITED STATES GREAT LAKES
SHIPPING ASSOCIATION
7714 Woodstar Lane
Concord Township, OH 44077-8993,

and,

WAGENBORG SHIPPING BV
Marktstraat 10
9934 CK Delfzijl, The Netherlands,

Plaintiffs,

v.

ADMIRAL PAUL F. ZUKUNFT, in his official
Capacity as Commandant, United States Coast Guard
2703 Martin Luther King Avenue SE
Washington, DC 20593-7000,

     and,

UNITED STATES COAST GUARD
2703 Martin Luther King Avenue SE
Washington, DC 20593-7000,

     Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs herein, American Great Lakes Ports Association, Brochart KB, Canfornav Inc., Fednav International Ltd., Polska Zegluga Morska P.P., Shipping Federation of Canada, Spliethoff Transport BV, United States Great Lakes Shipping Association, and Wagenborg Shipping BV, (collectively, "Plaintiffs"), by counsel, bring this complaint against the United States Coast Guard and its Commandant in his official capacity (collectively, "Defendants" or the "Coast Guard"), and allege the following:

## NATURE OF THE ACTION

1.     Plaintiffs seek review under the Administrative Procedure Act, 5 U.S.C. §§ 551-706 ("APA") of a final rule promulgated by the Coast Guard,  Great Lakes Pilotage Rates – 2016 Annual Review and Changes to Methodology, 81 Fed. Reg. 11,908 (March 7, 2016) (the "Final Rule").  The effective date of the Final Rule was April 6, 2016.

2.     The Coast Guard regulates certain aspects of marine pilotage, including pilotage rates paid by vessel owners and operators in the Great Lakes. *See* The Great Lakes Pilotage Act

of 1960, 46 U.S.C. § 9301-9308 (the "Act").  From 2006 to 2015, pilotage rates have increased

substantially.  Much of this increase has occurred in the last two navigation seasons.  In

comments submitted to the Coast Guard docket that led to the Final Rule, the Shipping

Federation of Canada, a Plaintiff herein, observed that pilotage is now one of the largest single

cost items for foreign-flag vessels that enter the St. Lawrence Seaway/Great Lakes System. *See*

Comments of Plaintiffs, USCG-2015-0497-53 (December 9, 2015) at 1 (*available at*

https://www.regulations.gov/#!docketBrowser;rpp=25;po=0;D=USCG-2015-0497 (last visited

May 31, 2016)) (the "Comments").

        3.      The Final Rule establishes new rate setting methodologies for determining Great

Lakes pilotage rates.  It also imposes substantial rate increases and additional pilotage surcharges

on vessels using U.S. pilots while transiting the Great Lakes in the 2016 navigation season.

        4.      The Final Rule violates core requirements of the APA, resulting in a

systematically biased rate-setting methodology exploitative of ratepayers, including Plaintiffs.

The Coast Guard set rates in the Final Rule based on numerous defects in its costs and revenue

calculations, and supported by faulty or unexplained logic. The Coast Guard failed to take proper

account of relevant factors, to consider important aspects of costs to ratepayers, to properly

respond to certain comments, including from Plaintiffs, and also, changed position on certain

issues without sufficient explanation. The Coast Guard's action is arbitrary and capricious and an

abuse of discretion.

        5.      For the reasons set forth herein, Plaintiffs ask that the Court declare unlawful and

vacate the Coast Guard's Final Rule, mandate that the Coast Guard reduce 2016 Great Lakes

pilotage rates by at least 20.6 percent for the duration of the current navigation season, and

6362175.15

remand the rulemaking to the Coast Guard for further development consistent with the Court's rulings herein.

## PARTIES

6.      Plaintiff American Great Lakes Ports Association ("AGLPA") is a Washington, D.C., not-for-profit association whose mission is, among other things, to represent the interests of commercial ports and port users on the United States side of the Great Lakes.  AGLPA member ports are served by ocean-going vessel operators subject to Great Lakes pilotage regulations.  Great Lakes ports are dependent on cost-effective waterborne commerce and, therefore, have a direct interest in a safe, efficient, reliable, and rationally priced pilotage system.

7.      Plaintiff Brochart KB is a Swedish based bulk and general cargo shipping company operating between Great Lakes and overseas ports. Brochart KB operates in the Great Lakes region and pays for pilotage services subject to the Final Rule.

8.      Plaintiff Canfornav Inc. is an international ocean carrier with a fleet of over 40 vessels.  Canfornav, Inc. serves the St. Lawrence River and Great Lakes, and is one of the largest ocean-going carriers serving that region.  Canfornav Inc. pays for pilotage services subject to the Final Rule.

9.      Plaintiff Fednav International Ltd. ("Fednav") is Canada's largest ocean-going dry-bulk shipowning and chartering group.  Fednav operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

10.     Plaintiff Polska Zegluga Morska P.P. ("Polsteam") is a Polish state enterprise that manages a fleet of 59 vessels.  Polsteam operates vessels in the Great Lakes region and pays for pilotage services subject to the Final Rule.

6362175.15

11.     Plaintiff Shipping Federation of Canada ("SFC") is a not-for-profit Canadian association created by an act of Canada's parliament in 1903.  SFC's mission is, among other things, to promote and protect the interests of the owners, operators, and agents of vessels involved in international trade, including trade on the St. Lawrence Seaway and Great Lakes. SFC has over 70 member companies from the United States, Canada, and other maritime nations representing over 250 ocean shipping companies.  Members of SFC, including the vessel owners and operators herein, that are Plaintiffs, pay for pilotage services subject to the Final Rule.

12.     Plaintiff Spliethoff Transport BV ("Spliethoff") is an independent company that manages a fleet of 50 vessels. Spliethoff operates in the Great Lakes region and pays for pilotage services subject to the Final Rule.

13.     Plaintiff United States Great Lakes Shipping Association ("USGLSA") is a not-for-profit association whose mission is, among other things, to protect the interests of its vessel agent members located at major ports throughout the Great Lakes.  USGLSA agents serve the international flag vessel fleet entering the Great Lakes and calling at Great Lakes ports. Members of USGLSA are the commercial maritime entities that directly arrange for Great Lakes pilotage services and as such, the matter of safe, reliable, and rationally priced pilotage is a vital concern to both USGLSA and its members.

14.     Plaintiff Wagenborg Shipping BV is an international shipping company that manages a fleet of 173 vessels.  Wagenborg Shipping BV vessels operate in the Great Lakes region and pay for pilotage services subject to the Final Rule.

15.     Defendant United States Coast Guard is an agency of the United States within the Department of Homeland Security.  The Coast Guard is, and was at all times and for the subject matters relevant hereto, an administrative agency of the United States Government subject to the

APA with regard to its rulemaking actions. *See* 5 U.S.C. § 551. The Coast Guard is

headquartered at 2703 Martin Luther King Avenue SE, Washington, DC 20593.

16.     Defendant Admiral Paul F. Zukunft is named as a defendant in his official

capacity as the Commandant of the United States Coast Guard. He serves as the head of the

Coast Guard in Washington, DC.

## JURISDICTION AND VENUE

17.     This action arises under the APA. This Court has subject-matter jurisdiction over

this action under 28 U.S.C. §§ 1331, 1337, 1361, and 1651. This Court is authorized to issue the

non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201,

and the APA, 5 U.S.C. §§ 702, 705, 706.

18.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because this is an action

against officers and agencies of the United States. Defendant United States Coast Guard is found

in this jurisdiction, Defendant Paul F. Zukunft performs his official duties in this judicial district,

and a substantial part of the events or omissions giving rise to this action occurred in this judicial

district.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A. Regulatory Background

19.     The Act requires foreign oceangoing vessels on the Great Lakes to use U.S. or

Canadian pilots while transiting the waters of the St. Lawrence Seaway and the Great Lakes

system. *See* 46 U.S.C. § 9302(a)(1). The Coast Guard is required by the Act to annually review

the rates paid to those pilots and to adjust the rates based on that review. *See* 46 U.S.C. §

9303(f).

20.     The Coast Guard is directed by the Act to "prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services." *Id*.  Congress also granted the Coast Guard authority to prescribe regulations governing the "operation and administration" of approved pilotage pools, to "prescribe a uniform system of accounts," to "perform audits and inspections," and to "require coordination on a reciprocal basis" with Canadian pilotage organizations.  46 U.S.C § 9304.

21.     In 1996, the Coast Guard issued Appendices A, B, and C to 46 C.F.R. parts 403 and 404 to provide methodologies for use in establishing pilotage rates.  *See* Great Lakes Pilotage Rate Methodology, 61 Fed. Reg. 21,081-01 (May 9, 1996) (*codified at* 46 CFR pts. 403, 404); *see also* Great Lakes Pilotage Rate Methodology, 60 Fed. Reg. 18,366-01 (Apr. 11. 1995).

22.     Appendix A to Part 404 – Ratemaking Analyses and Methodology is a legislative rule that the Coast Guard adopted after notice and comment.  *See* 60 Fed. Reg. 18,370 (Apr. 11, 1995), *redesignated at* 61 Fed. Reg. 32,655 (June 25, 1996), *further redesignated by* 62 Fed. Reg. 5,923 (Feb. 10, 1997), *further redesignated by* USCG-1998-3976, 63 Fed. Reg. 35,139 (June 29, 1998), *further redesignated by* USCG-2002-11288, 68 Fed. Reg. 69,578 (Dec. 12, 2003); 46 C.F.R. pt. 404, App. A.

**B.  The 2016 Notice of Proposed Rulemaking and Final Rule**

23.     On September 10, 2015 the Coast Guard issued a Notice of Proposed Rule Making.  *See* Great Lakes Pilotage Rates - 2016 Annual Review and Changes to Methodology, 80 Fed. Reg. 54,484 (Sept. 10, 2015) (the "NPRM").

24.     In the NPRM, the Coast Guard proposed pilotage rates for the 2016 navigation season and also proposed several revisions to the Appendix A methodology used to calculate the rates (the "Proposed Methodology").  *See id*.  The Coast Guard stated its intent that the Proposed

Methodology address "certain methodology issues" that "both pilots and industry" have

identified as issues that "significantly distort ratemaking calculations."  *Id.*

26. Under the Proposed Methodology the Director must:

(a) Review and recognize previous operating expenses based on audits of records provided by the pilot associations;

(b) Project each association's future operating expenses, adjusting for inflation or deflation;

(c) Project the number of pilots needed based on each area's peak pilotage demand data and the pilot work cycle;

(d) Set target pilot compensation using a compensation benchmark;

(e) Project each association's return on investment by adding the projected adjusted operating expenses and the total target pilot compensation and multiplying by the preceding year's average annual rate of return for new issues of high grade corporate securities;

(f) Calculate each association's needed revenue by adding the projected adjusted operating expenses, the total target pilot compensation, and the projected return on investment;

(g) Calculate initial base rates based on the preceding steps; and

(h) Adjust the initial base rates if necessary and reasonable to do so for supportable circumstances, and set final rates.

*See id.*

26. Plaintiffs, either individually or through organizations of which they are members,

submitted their Comments to the Coast Guard in response to the NPRM.  Plaintiffs' Comments

highlighted, among other things, the issues raised in this complaint.

8

27.     The Coast Guard promulgated its Final Rule on March 7, 2016 and the rule

became effective on April 6, 2016.  *See* 81 Fed. Reg. at 11,908.

28.     The Coast Guard's Final Rule failed to address the points raised by Plaintiffs in

any meaningful way or, to the extent Comments were addressed, the treatment of the Comments

was cursory, dismissive, without substance, and/or transparently pretextual.

## CAUSES OF ACTION

### COUNT I
*(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D)—*
*The Coast Guard Erroneously Failed to Consider the Effect of Weighting Factors on*
*Actual Pilot Revenues)*

29.     Plaintiffs incorporate by reference each and every allegation contained in

paragraphs 1 – 28 of the complaint as if fully set forth herein.

30.     Pilotage fees are calculated by multiplying an hourly pilotage rate by the hours

that the registered pilot is on the bridge or available to the master of the vessel.  This value is

then multiplied by a weighting factor.  Pursuant to 46 C.F.R. § 401.400 the weighting factor,

which is based on the size of the ship, ranges from 1.0 to 1.45.  *Id*.  Large vessels thus yield

greater pilotage fee revenues than do smaller vessels.

31.     The Coast Guard conducts its multi-step analysis to set pilotage rates to meet a

target revenue figure given the projected demand in the upcoming year.  The NPRM does not

apply weighting factors in calculating target pilotage fee revenues.  Despite comments

identifying this omission, the Final Rule does not reflect application of the weighting factor in

setting rates.  The Final Rule therefore overestimates the rate level needed to ensure achievement

of target pilotage revenues.  The Coast Guard's failure to apply actual data concerning the size of

vessels that require pilotage services will result in a significant over-realization of 2016 pilotage

revenues above and beyond the Coast Guard's target revenue amount.

32.     In their Comments to the NPRM, Plaintiffs asserted that the weighting factor

omission would "effect a dramatic increase in costs for all vessel owners, and this effect may be

especially harsh to vessels that operate on certain routes." Comment at 13.  The Plaintiffs also

encouraged the Coast Guard to update the Proposed Methodology to account for the "effect of

the weighting factor on anticipated revenues when setting rates." *Id*.

33.     Data were available to the Coast Guard that confirmed a relatively stable mix of

ship sizes over recent years resulting in a static average weighting factor.  *See* Comment at 12, n.

2.  The Canadian Great Lakes Pilotage Authority ("GLPA") collects data on the number of

vessels that transit the Great Lakes by weighting factor class.  This data shows that in 2014, the

average weighting factor for all vessels transiting the Great Lakes was 1.28.  Similarly, data from

January through November 2015, (December data was unavailable at the time of Plaintiffs'

Comments), confirms that the average weighting factor was 1.26.   Available data also confirms

that all vessels trading commercially on the Great Lakes have a weighting factor of at least 1.15

(except a small number of yachts or passenger vessels). *See id*.

34.     The Coast Guard dismissed Plaintiffs' Comments by stating that "[g]iven the high

variability from year to year in the number and types of vessels requiring pilotage, we have never

considered weighting factors in projecting revenue projections of the rate."  81 Fed. Reg. at

11,923.  However, the Coast Guard has acknowledged in past ratemaking exercises that

adjustments to the weighting factor affect estimated pilot revenues.  *See* Great Lakes Pilotage

Rates – 2014 Annual Review and Adjustment, 78 Fed. Reg. 48,374-01, 48,376 (Aug. 8, 2013)

("[w]e believe this weighting factor adjustment will increase U.S. pilot association revenues by

approximately 6 to 7.5 percent.").

35.     The Coast Guard's failure to account for the weighting factor in the Final Rule

will result in an over-collection of revenues in 2016 and was arbitrary and capricious and an

abuse of discretion, given the availability of data showing that vessels exceed the 1.0 factor

assumed and adopted by the Coast Guard.

36.     In promulgating the Final Rule without reasonably addressing Plaintiffs' and

others' weighting factor objections, the Coast Guard acted arbitrarily and capriciously, abused its

discretion, and acted contrary to law, in excess of statutory authority and limitation, and without

observance of procedure required by law, within the meaning of 5 U.S.C. §§ 706(2)(A), (C) and

(D).

## COUNT II
### *(Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D) --*
### *The Coast Guard Final Rule Deviates from Past Practice without Explanation)*

37.     Plaintiffs incorporate by reference each and every allegation contained in

paragraphs 1 – 36 of the complaint as if fully set forth herein.

38.     The Coast Guard has taken into account the difference between projected and

actual revenues in prior rulemakings but, without explanation, failed to do so in this rulemaking.

11

39.     In 2015, the Coast Guard addressed comments from pilots that asked it to adjust the target revenue needed to account "for the differences between actual and projected revenue." *See* Great Lakes Pilotage Rates – 2015 Annual Review and Adjustment, 80 Fed. Reg. 10,365-01, 10,368 (Feb. 26, 2015).  The Coast Guard noted that "audits for the 2013 Appendix A rulemaking demonstrate[d] a significant shortfall," and in response the Coast Guard decided to "adjust[] [its] rate increase to 10 percent across all districts to begin aligning actual and projected revenues." *Id*.

40.     In this NPRM, the Coast Guard stated that the total 2015 projected revenue received by pilots would be $12,289,193.00.  This figure was determined by estimating that 2014 revenues were 2.5 percent above 2013 audited revenue figures, and that the 2015 revenues would be 10 percent above the 2014 revenues.  *See* 80 Fed. Reg. at 54,502, Figure 24.

41.     At the time the NPRM and Final Rule were issued, the Coast Guard had in its possession, and this information was posted in the docket, audited and verified financial information that stated that 2014 revenues of the three pilot associations were $18.3 million, or approximately $4.1 million in excess of the target revenues the Coast Guard authorized under the 2014 Final Rule.

42.     Plaintiffs commented that the Coast Guard should maintain "accurate, current operational data" to allow a "truing up" of the "disparities between projections and actual data for a given period [that] yield[s] excess revenue collections." *See* Comment at 2-3.

43.     However, in contrast to its actions in 2015, the Coast Guard did not take note of the pilot association's over-realization of revenues reflected in the audited financials for 2014.

44.     The Coast Guard dismissed Plaintiffs' Comments and request out of hand with conclusory language.  The Final Rule summarily states, "we believe we have provided extensive evidence in support of our analysis of association expenses and revenues."  81 Fed. Reg. at 11,923.  But the Coast Guard failed to address Plaintiffs' request to address the difference between projected and actual revenues.  *See id.*

45.     The Coast Guard deviated without adequate explanation or rationale from its past practice of adjusting the rates to reflect its miscalculation of actual revenues in previous years as a result of available audited financial information.

46.     In promulgating the Final Rule, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law, in excess of statutory authority and limitation, and without observance of procedure required by law, within the meaning of 5 U.S.C. §§ 706(2)(A), (C) and (D).

## COUNT III
### *(Violation of the Administrative Procedure Act, 5 U.S.C. §§ 706(2)(A), (C) and (D) -- The Coast Guard Failed to Engage in Reasoned Decision Making)*

47.     Plaintiffs incorporate by reference each and every allegation contained in paragraphs 1 – 46 of the complaint as if fully set forth herein.

### *Peak Staffing*

48.     In setting pilotage rates, the Final Rule determines the number of pilots needed based on "the average number of pilots needed to meet peak demand."  81 Fed. Reg. at 11,932.

49.     The Coast Guard offered this peak-demand model in the NPRM, where it proposed a rate designed to support employment of the "number of pilots needed to meet each shipping season's peak pilotage demand period without interruption to service."  80 Fed. Reg. at 54,489.

13

50.     The Coast Guard provided two reasons in the NPRM to support this change: (1) "pilots frequently have commented in previous years' ratemaking rules that we should take into account necessary demands on pilot time that go beyond bridge hours"; and (2) pilots have commented that "Step 2.B does not specify sources for our bridge hour projections and that inaccurate projections distort the rest of our ratemaking calculations." *Id*.

51.     The Coast Guard acknowledged in the NPRM that "peak traffic demand is concentrated at the beginning of a shipping season, to handle the traffic buildup created by the previous season's closures, and at the end of the season, when the vessels seek to complete their voyages before closure." 80 Fed. Reg. at 54,490.

52.     Yet, in the Final Rule, the Coast Guard applies its peak-demand staffing model to the entirety of the navigation season.

53.     Plaintiffs commented that the 2013 Bridge Hour Definition and Methodology Study, relied on by the Coast Guard, indicates that, as of 2011, vessels experienced few delays caused by pilot shortages and that on many other days during the same period the number of staffed pilots exceed the number needed to handle available assignments. *See* Comment at 14-15.

54.     Plaintiffs also commented that the peak-demand staffing model was "inefficient, costly, and not something that users of pilotage services have demanded or advocated." *Id*. at 15.

55.     Plaintiffs commented that the Coast Guard did not adequately study the effect of the peak-staffing model in light of the dramatic increase in costs to ratepayers. *See id*. at 16. Plaintiffs suggested that "efficiency, safety, and cost-awareness can be reasonable and responsibly addressed at a less-than-peak-demand ratemaking assumption" and that it was unnecessary for the Coast Guard to "strive for zero delays in the system." *Id*.

14

56.     Rather than address the concerns raised by the Comments, the Coast Guard dismissed Plaintiffs comments in two sentences.  First, the Coast Guard stated the obvious fact that while traffic peaks were most likely at the beginning and end of the shipping season, such peaks "could occur at other times as well."  81 Fed. Reg. at 11,922.

57.     Second, the Coast Guard repeated its own premise that a zero-delay model was necessary by stating that "[s]etting pilot numbers high enough to accommodate all these peak period is essential for reducing traffic delays during peak periods[.]" *Id*.  The Coast Guard also noted, without any explanation, the tangential issue that high pilot numbers would also help it to "provide the recuperative monthly rest period recommended by the NTSB[.]"  *Id*.

58.     Neither the NPRM nor the Final Rule provide any clear rationale for requiring a peak-demand staffing model.  And in fact, the only delay data utilized by the Coast Guard suggest that delays caused by pilot understaffing are rare.  *See* 2013 Bridge Hour Definition and Methodology Study, pp. C- 14-16.

59.     Plaintiffs also suggested that the Coast Guard evaluate less-costly alternative means of providing pilotage service during peak periods, such as contract pilots and "cross-qualifying pilots such that pilots from one area are able to help relieve traffic delays in another area." Comment at 16.

60.     The Coast Guard failed to address Plaintiffs' suggestion that the Coast Guard permit cross-qualifying pilots to alleviate peak demand, inaccurately stating that "the coalition did not propose any other alternatives for our consideration." 81 Fed. Reg. at 11,922.

61.     The Coast Guard failed to provide a rational basis in support of its decision to rely on a peak-demand staffing model and ignored viable alternatives suggested by Plaintiffs to

6362175.15

reduce delays during peak demand periods.  The peak-demand staffing assumption of the Final

Rule will result in an over-realization of revenues in the 2016 navigation season.

### U.S. Pilots' Target Compensation

62.     The Coast Guard failed to provide reasoned decision making when it set U.S.

pilot target compensation at a rate of 10 percent above projected 2016 Canadian compensation

figure.

63.     The NPRM stated that the "difference in status between GLPA employees and

independent U.S. pilots creates significant differences in their relative compensation." 80 Fed.

Reg. at 54,498.  No empirical support was offered for this conclusory statement.

64.     The Coast Guard suggested that it could account for this perceived difference

between U.S. and Canadian pilot compensation by "adjusting U.S. target pilotage compensation

by increasing it 10 percent over our projected 2016 GLPA compensation figure." *Id*.

65.     This 10 percent adjustment figure suggested in the NPRM was established by the

Coast Guard's reliance on certain comments, apparently informal, of some members of Great

Lakes Pilotage Advisory Committee ("GLPAC") at a July 2014 meeting.  *Id*.

66.     GLPAC is a congressionally authorized federal advisory committee.  *See* Federal

Advisory Committee Act, 5 U.S.C. § 1, *et seq*.  The purpose of GLPAC is to serve as a sounding

board for the Coast Guard to consult when taking significant action and formulating policy

relating to the Great Lakes.  *See* 46 U.S.C. § 9307.

67.     The Coast Guard acknowledged in the NPRM that there were "no economic data

that suppl[ied] supportable circumstances for additional adjustments to target pilot

compensation" and requested public comment on that point.  80 Fed. Reg. at 54,498.

68.     Plaintiffs and other commenters noted the complexity of making comparisons between Canadian and U.S. pilotage compensation levels and suggested several comparability adjustments to determine what, if any, rate increase would be appropriate above 2016 Canadian pilotage compensation figures.  Suggestions included considerations such as cost of living, healthcare costs, pilotage costs, tax regimes, currency, government-provided benefits, and pilot work functions.  *See* 81 Fed. Reg. at 11,915.

69.     While the Coast Guard mentions and dismisses some of these factors, it ultimately decided to rely on the 10 percent adjustment as "an approximation based on several statements made at the 2014 GLPAC meetings, which were not challenged at the time by industry representatives."  *Id*.

70.     In reality, only two statements were made at the cited GLPAC meetings regarding an appropriate adjustment figure.  One statement was made by an unidentified speaker.  *See* Great Lakes Advisory Committee 07-24-2014 Meeting Transcripts at 45:7-8 ("MALE: [$295,000 is] the Canadian rate times 10 percent.  It's the Canadian number times 10.").  The second statement was similarly opaque.  *See id*. at 45:9-15 ("MR. BOYCE: I think that's well justifiable to be 10 percent higher.").

71.     The Coast Guard cites no other evidence to support its comparability conclusion other than these statements made during informal discussions by two individuals in attendance at a July 24, 2014 GLPAC meeting.

72.     In promulgating a Final Rule without reasonably addressing Plaintiffs' and others' objections to its analysis of comparability to Canadian pilotage compensation, the Coast Guard acted arbitrarily and capriciously, abused its discretion, and acted contrary to law, in excess of

6362175.15

statutory authority and limitation, and without observance of procedure required by law, within the meaning of 5 U.S.C. §§ 706(2)(A), (C) and (D).

### *Pilot Recruitment & Retention*

73.     The Coast Guard, in its NPRM, cited pilot associations' claims that "several experienced pilots have left the system and that other desirable mariners have been discouraged from applying" due to the pilots' associations having inadequate revenues to recruit and retain adequately qualified pilots.  80 Fed. Reg. at 54,486.

74.     The Coast Guard noted Plaintiffs' Comment that the Coast Guard's "analysis of pilot attraction and retention issues is not founded on tested data" and that the Coast Guard had "produced no data establishing that there are difficulties in attracting and retaining qualified pilots, or that there is a relationship between those difficulties and low pilotage rates."  81 Fed. Reg. at 11,919.

75.     Not until publication of the Final Rule did the Coast Guard offer support for its alleged "attraction and retention" analysis.  The totalities of the Coast Guard's retention analysis in the Final Rule is this:

> Our analysis shows that over the last 11 years, 31 pilots have left the Great Lakes pilotage associations. Of these 31 pilots, 9 went to other unspecified jobs, 5 went to another system outside the Great Lakes, 5 took mariner positions on board lakers, 1 went back to deep sea shipping, 1 became a training instructor, 1 went to another district, 1 took work with a dredging company, and 8 gave no reported reason for leaving.

81 Fed. Reg. at 11,919.

76.     These data were not provided in the NPRM, were not cited in comments, and were not identified as to source in the Final Rule.

18

77.     These figures do not support the Coast Guard's conclusion that there is a problem with recruitment and retention in the Great Lakes.  The statistics cited provide no information regarding the causes for each pilot's departure.

78.     The Coast Guard justifies the need for additional revenue to support recruitment and retention efforts by comparing total delay hours against pilot strength from 2007 to 2015, stating that "pilot shortfalls are one important factor" that contributes to delays.  81 Fed. Reg. at 11,921.  It reaches this conclusion despite data in the record that contradict its findings.  For example, from 2009 to 2010 total delay hours increased by almost 35 percent despite the number of pilots remaining the same.  *See* 81 Fed. Reg. at 11,920.  From 2011 to 2013, during a period when the number of pilots was again stable, the region experienced both a 7 percent drop in delays followed by a 136 percent increase in delays.  *See id*. Finally, between 2013 and 2015, when the total number of pilots decreased by two, the amount of delays experienced dropped by 25 percent.  *See id*.

79.     The Coast Guard failed to address any of the suggestions Plaintiffs made to improve recruitment efforts, such as studying: (1) "whether entry barriers, such as apprentice periods, buy-in costs, application requirements, etc. discourage applicants, or conversely, whether modest financial incentives paid to applicants at the outset of the recruitment process might encourage new applicants"; and (2) "whether other available incentives would improve the pilot associations' abilities to attract and retain new pilots such as quality of life, living standards, and job satisfaction[.]"  Comment at 35.

80.     The Coast Guard summarily dismissed these suggestions, stating that "the remedies suggested by the coalition may not work and could take longer than the system can sustain in the face of more pilot departures and the inability to replace those pilots. We doubt that

the coalition's suggestions would be effectual, given the career-long prospects a recruit or new pilot faces for lower compensation than their counterparts in Canada side or in other U.S. ports." 81 Fed. Reg. at 11,921.

81.     Instead, the Coast Guard relied, without analysis or examination, on the pilot associations' general, non-empirical complaints concerning recruitment and retention by arguing, "[t]he pilots have emphasized these issues repeatedly at pilotage summits and GLPAC meetings, and we are not aware of evidence that the pilots' emphasis is misplaced." *Id*.

82.     The mere recitation of unsourced departure statistics in the Final Rule and comparisons of delay hours with pilot strength fall far short of the "disciplined, empirical evaluation of recruitment issues" requested by Plaintiffs.  Comment at 35.

83.     The failure to offer the requisite support for unsourced departure statistics in the Final Rule and comparisons of delay hours with pilot strength constitutes arbitrary and capricious conduct, an abuse of discretion, and action contrary to law, in excess of statutory authority and limitation, and without observance of procedure required by law, within the meaning of 5 U.S.C. §§ 706(2)(A), (C) and (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(a)     Hold unlawful and set aside the Final Rule as arbitrary, capricious, an abuse of discretion, in excess of statutory authority or limitation or short of statutory right, and contrary to procedures required by law;

(b)     Remand the subject rulemaking proceeding to the Coast Guard for revision and review consistent with the decision of this Court;

6362175.15

(c)     Direct the Coast Guard to reduce immediately 2016 Great Lakes pilotage rates by 20.6 percent to reflect the arithmetic effect of weighting factors on actual revenues in excess of target revenues and to credit in the calculation of future rates the 2016 pilotage fees already paid subject to weighting factors in excess of 1.0;

(d)     Award Plaintiffs their costs and reasonable attorneys' fees as appropriate; and

(e)     Award Plaintiffs such further and other relief as this Court deems proper.

Dated: *31 May 2016*

Respectfully submitted,

THOMPSON COBURN LLP

By _____
C. Jonathan Benner, DC – 181610
1909 K Street, N.W.
Suite 600
Washington, D.C.  20006-1167
202-585-6900
FAX 202-585-6969
jbenner@thompsoncoburn.com

*Attorney for Plaintiffs*

21

6362175.15