**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| AMERICAN GREAT LAKES PORTS ASSOCIATION, *et al.*, | |
| Plaintiffs, | |
| v. | Civ. A. No. 1:16-cv-1019-RC |
| UNITED STATES COAST GUARD, *et al.*, | |
| Defendants. | |

**PLAINTIFFS' COMBINED REPLY MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S AND DEFENDANT-INTERVENORS' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs American Great Lakes Ports Association, Brochart KB, Canfornav Inc., Fednav International Ltd., Polska Zegluga Morska P.P., Shipping Federation of Canada, Spliethoff Transport BV, United States Great Lakes Shipping Association, and Wagenborg Shipping BV hereby submit this combined reply memorandum in support of their Motion for Summary Judgment and opposition to Defendants U.S. Coast Guard and Admiral Paul F. Zukunft's Cross-Motion for Summary Judgment and Defendant-Intervenors (the "Pilot Associations") St. Lawrence Seaway Pilots Association, Lakes Pilots Associations, Inc., and Western Great Lakes Pilots Association, LLP's Cross-Motion for Summary Judgment.

## TABLE OF CONTENTS

I.     Introduction ................................................................................................. 1

II.    Standard of Review .................................................................................... 3

    A.    The Pilot Associations Misapply The Substantial Evidence Standard. ................. 3

    B.    The Coast Guard's Ratemaking Efforts Are Not Entitled To Heightened Deference. ............................................................................ 5

III.   Argument ................................................................................................... 10

    A.    The Coast Guard Cannot Simply Disregard The Calculable, Real World Impacts Of The Weighting Factor On Pilotage Costs. ............................. 10

    B.    The Final Rule Fails To Account For Over Or Under Collection Of Revenue, Improperly Deviating From Prior Agency Practice, And Relies On A Demonstrably And Materially Inaccurate Figure To Support The 2016 Rate Increase. .................................................................. 15

    C.    The Coast Guard's Decision To Use A Peak Staffing Model Violates The APA Because It Is Unsupported By Adequate Evidence. The Coast Guard Failed To Address Plaintiffs' Comments On This Point. ................ 20

    D.    The Coast Guard's Decision To Set U.S. Pilot Target Compensation At A Rate 10 Percent Above Projected 2016 Canadian Compensation Is Arbitrary And Unreasonable. ..................................... 26

    E.    The Final Rule Lacks Requisite Support For Its Conclusions That There Is A Pilotage Retention Problem Or That This Supposed Problem Is Caused By Inadequate Pilot Revenue. ................................ 30

IV.   This Court Has Authority To Remedy The Coast Guard's APA Violations. .................. 33

V.    Conclusion ................................................................................................ 36

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Action on Smoking & Health v. Civil Aeronautics Bd.,* 699 F.2d 1209 (D.C. Cir. 1983) .................... 14, 28

*Aeron Marine Shipping Co. v. U.S.*, 695 F.2d 567 (D.C. Cir. 1982) ........................................... 12

*Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359 (1998) ........................... 5

*Allied-Signal, Inc. v. NRC*, 988 F.2d 146 (D.C. Cir. 1993) ........................................ 35

*Ass'n of Private Sector Coll. & Univ. v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012) .............................. 14, 28

*Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) ................................... 6

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204 (1988) ......................................... 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ...................................... 5

*City of Brookings Mun. Telephone Co. v. F.C.C.*, 822 F.2d 1153 (D.C. Cir. 1987) ................................. 12

*City of Charlottesville, Va. v. Fed. Energy Regulatory Comm'n*, 661 F.2d 945 (D.C. Cir. 1981) .................................................................... 4

*Columbia Broad. Sys, v. F.C.C.*, 454 F.2d 1018 (D.C. Cir. 1971) ............................................... 31

*Columbia Gas Transmission Corp. v. Fed. Energy Regulatory Comm'n*, 628 F.2d 578 (D.C. Cir. 1979) .............................................................. 4

*Conservation Force v. Salazar,* 916 F. Supp. 2d 15 (D.D.C. 2013) ............................................. 6

*Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 549–50 (1980). ........................ 8

*CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076 (D.C. Cir. 2009) ............................... 18

*Darden v. Thompson*, 101 Va. 635, 44 S.E. 755 (1903), *aff'd*, 198 U.S. 310, 25 S. Ct. 660, 49 L. Ed. 1064 (1905) ........................................................ 31

*Estes v. U.S. Dep't of the Treasury*, No. 1:16-CV-00450 (CRC), 2016 WL 6956594 (D.D.C. Nov. 28, 2016) .................................................. 18

*Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) ............................... 4

*Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997) ...................................... 3

*Heartland Regional Med. Center v. Sebelius*, 566 F.3d 193 (D.C. Cir. 2009) ........................... 33

*Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133 (2d Cir. 1994) ...................................... 31

*Jackson v. Marine Exploration Co.,* 583 F.2d 1336 (5th Cir. 1978) ............................................. 31

*Jersey Cent. Power & Light Co. v. F.E.R.C.,* 810 F.2d 1168, 1189 (D.C. Cir. 1987) ..................... 9

*Judulang v. Holder,* 132 S.Ct. 476 (2011) ...................................................................................... 30

*Lake Pilots Ass'n v. U.S. Coast Guard,* 257 F. Supp. 2d 148 (D.D.C. 2003) ................................. 3

*Lake Pilots Ass'n v. U.S. Coast Guard,* 359 F.3d 624 (D.C. Cir. 2004) ......................................... 3

*Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.,* 741 F.3d 1309
      (D.C. Cir. 2014) ...................................................................................................................... 18

*Louisiana Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.,* 336 F.3d 1075 (D.C. Cir.
      2003) ...................................................................................................................... 25, 28, 30

*Mayo v. Jarvis,* No. 14-1751 (RC), 2016 WL 4083308 (D.D.C. Aug. 1, 2016) ............................. 5, 19, 23

*Mendoza v. Perez,* 72 F. Supp. 3d 168, 175 (D.D.C. 2014) ........................................................... 33

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29
      (1983) ....................................................................................................................................... 6

*Performance Contracting, Inc. v. Rapid Response Constr., Inc.,* 267 F.R.D. 422 (D.D.C.
      2010) ........................................................................................................................................ 6

*Pharm. Research and Mfrs. Of Am. v. U.S. Dep't of Health and Human Services,* 43 F.
      Supp. 3d 28, 33 (D.D.C. 2014) ............................................................................................. 23

*Public Citizen, Inc. v. Lew,* 127 F. Supp. 2d 1 (D.D.C. 2000) ........................................................ 5

*Ramaprakash v. F.A.A.,* 346 F.3d 1121 (D.C. Cir. 2003) .............................................................. 30

*Select Specialty Hosp.-Bloomington, Inc. v. Burwell,* 757 F.3d 308 (D.C. Cir. 2014) ............... 29

*Sprint Corp. v. FCC.,* 331 F.3d 952 (D.C. Cir. 2003) ................................................................... 18

*St. Lawrence Pilots Ass'n v. U.S. Coast Guard,* Case No. 1:14-cv-00392-TSC, ECF No.
      14 (D.D.C. Aug. 28, 2014) ................................................................................................. 6, 35

*St. Lawrence Seaway Pilots' Ass'n v. Collins,* 362 F. Supp. 2d 59 (D.D.C. 2005) ....................... 3

*St. Lawrence Seaway Pilots' Ass'n v. Collins,* No. Civ. A. 03-1204 (RBW), 2005 WL
      1138916 (D.D.C May 13, 2005) ............................................................................................. 3

*St. Lawrence Seaway Pilots' Ass'n v. U.S. Coast Guard,* 85 F. Supp. 3d 197 (D.D.C.
      2015) ........................................................................................................................................ 3

*Tex Tin Corp. v. EPA,* 935 F.2d 1321 (D.C. Cir. 1991) ................................................................ 18

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury,* 750 F. Supp. 2d 150 (D.D.C.
      2010) ........................................................................................................................................ 5

iii

**Statutes and Constitutional Provisions**

Administrative Procedure Act, §706 *et seq*. ............................................................. *passim*

Coast Guard. Public Law 86-555, §5(a), 74 Stat. 25 (1960) ............................................... 7

Great Lakes Pilotage Act, 46 U.S.C. § 9301 *et seq*. ................................................... 7, 8

Public Law 89-670, § 6(a)(4), 80 Stat. 937 (1966) ..................................................... 8

**Other Authorities**

Great Lakes Pilotage Rates—2014 Annual Review and Adjustment, 79 Fed. Reg. 12,084
  (March 4, 2014) (Final Rule) ..................................................................... 12

Great Lakes Pilotage Rates—2016 Annual Review and Changes to Methodology, 81 Fed.
  Reg. 11,908 (March 7, 2016) (Final Rule) ................................................ *passim*

Great Lakes Pilotage Rates – 2015 Annual Review and Adjustment, 80 Fed. Reg. 10,365
  (May 26, 2015) (Final Rule) ................................................................ 19, 20

Great Lakes Pilotage Rates – 2016 Annual Review and Adjustment, 80 Fed. Reg. 54,484
  (Sept. 10, 2015) (NPRM) .................................................................... 21, 24

Great Lakes Pilotage Rates-2014 Annual Review and Adjustment, 78 Fed. Reg. 48,374
  (Aug. 8, 2013) (NPRM) ..................................................................... 10, 13

Great Lakes Pilotage Regulations, 46 C.F.R. § 401.400 *et seq*. ........................... 10, 13

NTSB Recommendation M-15-005,
  http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-005 (last
  visited Dec. 23, 2016) ......................................................................... 23

NTSB Recommendation M-15-006,
  http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-006 (last
  visited Dec. 23, 2016) ......................................................................... 23

NTSB Recommendation M-15-007,
  http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-007 (last
  visited Dec. 23, 2016) ......................................................................... 23

S. Rep. No. 86-1284 (1960) ..................................................................... 7

6482701.7

## I.      Introduction

Plaintiffs seek vacatur of the Coast Guard's final rule (the "Final Rule") creating an

eight-step methodology for determining Great Lakes pilotage rates and applying that

methodology to set rates for the 2016 navigation season. Great Lakes Pilotage Rates—2016

Annual Review and Changes to Methodology, 81 Fed. Reg. 11,908 (March 7, 2016) (hereinafter

"2016 Final Rule"). Plaintiffs, ratepayers and other interests affected by rapidly increasing

pilotage fees, contend that several elements of the Final Rule violate the Administrative

Procedure Act ("APA").

In promulgating the Final Rule, the Coast Guard inadequately addressed information

provided by commenters, including Plaintiffs, failed to engage in reasoned decisionmaking, and

failed to articulate a rational basis for both its choices of information and its final decisions.

Specifically, the Coast Guard unlawfully: (1) failed to account for the positive effect of a

mandatorily imposed weighting factor on pilotage revenue; (2) departed without adequate

explanation from its prior practice of accounting for differences between projected and actual

revenue figures; (3) used a peak-staffing model to determine the number of pilots needed without

adequate evidence or consideration of relevant factors; (4) arbitrarily set U.S. pilot compensation

10% above Canadian pilot compensation; and (5) failed to support its assumptions that pilot

recruitment and retention are a problem on the Great Lakes, and that to the extent there is such a

problem it can be rectified by increasing pilotage rates. Plaintiffs request that the Court remand

this matter to the Coast Guard for further proceedings consistent with the Court's analysis of

these issues.

Defendants and Defendant-Intervenors each rely heavily on the recruitment/retention

issue, arguing throughout their submissions that the Final Rule is the result of a Coast Guard

determination that there is a pilot retention problem on the Great Lakes caused by inadequate pilot compensation. ECF No. 20-1, p. 6; ECF No. 21, p. 7.[1] However, as described here, neither the Coast Guard's assumption that there is a pilotage retention issue nor that this issue is caused by deficient revenues in the system, is based on the requisite reasonable consideration of relevant factors. Instead, the Coast Guard improperly and without stated justification formed this conclusion and then reverse-engineered a ratemaking methodology and 2016 pilotage rates aimed at substantially increasing Pilots' revenues. The result has serious, APA-violative flaws. Plaintiffs seek vacatur of the Final Rule and specific direction from the Court on the parameters of a lawful ratemaking effort so that the Coast Guard's 2017 effort can yield an efficient, economically sustainable rate structure that fairly compensates competent pilots for their contributions to navigation on the Great Lakes, consistent with statutory requirements that the Coast Guard consider the public interest and the costs of pilotage services.

Plaintiffs are either direct ratepayers of pilotage rates set by the Coast Guard or are economic interests affected by the costs of shipping services, including pilotage rates, in the Great Lakes region. Each Plaintiff is engaged in shipping, either directly or indirectly—not pilotage. In short, Plaintiffs' interests in this matter are diffuse, and they have joined for purposes of this litigation in the face of steep and sudden pilotage rate increases over the past three navigation seasons on the Lakes, increases that are now in the 100% order of magnitude and that

---

[1] References in this memorandum to opposition briefing will be to the Coast Guard's Cross-Motion for Summary Judgment (ECF No. 21) rather than to its identical opposition brief (ECF No. 22). Similarly, references to the Pilots' briefing will be to its Cross-Motion (ECF No. 20), rather than its near-identical opposition brief (ECF No. 19), unless necessary.

make pilotage a substantial cost item for a shipping industry now beset by historically low shipping rates.[2]

Legal challenges to the Coast Guard pilotage ratemaking efforts have been the subject of six opinions from this Court and/or Circuit in the last twenty years.[3] The chronic controversy surrounding the Coast Guard pilotage ratemaking functions bespeak, in Plaintiffs' view, institutional discomfort and inability to manage a function that is distinctly alien to the primary Coast Guard missions related to homeland security, law enforcement, marine safety, and environmental protection.

## II.     Standard of Review

### A.   The Pilot Associations Misapply The Substantial Evidence Standard.

The Pilot Associations' memorandum includes excerpts from the rulemaking record that the Pilot Associations believe support their supposition that individual pilots are undercompensated and that this causes pilotage retention issues. ECF No. 20-1, pp. 6-10. This record evidence consists largely of anecdotal comments by individual pilots or those aligned

---

[2] The Coast Guard in the Final Rule and Intervenor Pilot Associations seek to minimize Plaintiffs' assertions of adverse cost impacts by comparing pilot costs to large, macro-figures measuring the overall Great Lakes region economy, as opposed to the much smaller direct costs experienced by ratepayers in the operations of the vessels. 81 Fed. Reg. 11,924. The Pilot Associations claim "85% of the pilotage costs incurred by shipping companies on the Great Lakes [in] 2014 came from Canadian pilotage and not the U.S. pilotage system." ECF No. 20-1, p. 17. This data point, however applies to all Canadian pilotage on the St. Lawrence River, the Seaway, and the Great Lakes, including large pilotage vessel volumes that occur only in the Canadian jurisdiction and include a substantial category of oceangoing vessels that do not enter the Great Lakes.

[3] *See Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997); *Lake Pilots Ass'n v. U.S. Coast Guard*, 257 F. Supp. 2d 148 (D.D.C. 2003) (granting pilots motion in part); *Lake Pilots Ass'n v. U.S. Coast Guard*, 359 F.3d 624 (D.C. Cir. 2004) (unsuccessfully appealing the 2003 challenge to the extent it was unfavorable to pilots interests—the underling decision granted the Pilot Associations' summary judgment in part); *St. Lawrence Seaway Pilots' Ass'n v. Collins*, 362 F. Supp. 2d 59 (D.D.C. 2005) (denying motion for summary judgment on issue of whether Coast Guard delay was reasonable but maintaining jurisdiction while Coast Guard completed rulemaking); *St. Lawrence Seaway Pilots' Ass'n v. Collins*, No. Civ. A. 03-1204 (RBW), 2005 WL 1138916 (D.D.C May 13, 2005) (vacating prior decision because Coast Guard had completed rulemaking effort); *St. Lawrence Seaway Pilots' Ass'n v. U.S. Coast Guard*, 85 F. Supp. 3d 197 (D.D.C. 2015) (successful pilot challenge to 2014 ratemaking).

3

with the Pilot Associations, not substantive, number-driven data. *Id.* at 6-11. According to the Pilot Associations, "the record contains substantial evidence that U.S. Great Lakes pilots continue to be undercompensated in comparison with pilots regulated by other jurisdictions." *Id.* at 11. The Pilot Associations move from this position to their overall argument that the specific APA violations noted by Plaintiffs are of no moment because, according to the Pilot Associations, "Plaintiffs have not shown and cannot show that the pilots' overall level of compensation is unreasonable or contrary to the public interest." *Id.* at 12.

The Pilot Associations rely on *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), for the proposition that "if the total effect of the rate order cannot be said to be unjust and unreasonable" then the "fact that the method employed to reach that result may contain infirmities is not then important." This case is inapposite. More recent decisions have noted that "[j]udicial review evolved from the end result test enunciated by Justice Douglas in [*Hope Natural Gas*]." *City of Charlottesville, Va. v. Fed. Energy Regulatory Comm'n*, 661 F.2d 945, 950 (D.C. Cir. 1981) ("Experience has taught that a determination of whether the result reached is just and reasonable requires an examination of the method employed in reaching that result."). "Indeed, [the D.C. Circuit] has required the [rate-setting agency] to specify the evidence on which it relied and to explain how that evidence supports the conclusion it reached." *Id.* (citing *Columbia Gas Transmission Corp. v. Fed. Energy Regulatory Comm'n*, 628 F.2d 578, 589 n.51 (D.C. Cir. 1979)). Moreover, *Hope Natural Gas* precedes the 1946 enactment of the APA, which gives rise to each of Plaintiffs' claims and governs Plaintiffs' right to relief.

Here and in the rulemaking proceedings below, Plaintiffs have directly challenged both the "total effect" and the process by which the Coast Guard reached its final rate determination. Substantial evidence requires the Coast Guard to indicate the record support for its positions in

the Final Rule. Neither the Coast Guard nor the Pilots may use the record now, in litigation, to try to backfill the requisite support for the Final Rule. Such post-hoc rationalizations cannot insulate the Final Rule from Plaintiffs' APA challenge. *See Mayo v. Jarvis*, No. 14-1751 (RC), 2016 WL 4083308, at *5 (D.D.C. Aug. 1, 2016) ("[t]he post hoc rationalization rule prohibits a court from upholding an agency's decision based on rationalizations offered for the first time in litigation affidavits and arguments of counsel") (internal quotations omitted). Post hoc rationalizations cannot be "substitute[d] for an agency's failure to articulate a valid rationale in the first instance" and "do not necessarily reflect the views of the agency, but rather may have been developed hastily, without adequate consideration of opposing positions pursuant to the agency's normal deliberative process." *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 154–55 (D.D.C. 2010) (quoting *Public Citizen, Inc. v. Lew,* 127 F. Supp. 2d 1, 10 (D.D.C. 2000)).

**B. The Coast Guard's Ratemaking Efforts Are Not Entitled To Heightened Deference.**

Plaintiffs have brought this cause pursuant to the APA, asking the Court to hold unlawful and set aside the Final Rule because it is arbitrary and capricious, an abuse of discretion, and contrary to law (§ 706(2)(A)), in excess of statutory authority and limitation (§ 706(2)(C)), and without observance of procedure required by law (§706(2)(D)). The APA "establishes a scheme of reasoned decisionmaking." *Allentown Mack Sales & Serv., Inc. v. Nat'l Labor Relations Bd.*, 522 U.S. 359, 374 (1998) (citation and quotation marks omitted). In order to determine whether a challenged agency action is arbitrary and capricious, a reviewing court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). "The agency must examine the relevant data and articulate a satisfactory explanation for

its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

While certain ratemaking efforts involve an agency's technical or subject matter expertise and therefore warrant additional, heightened deference, this is not such a case. Notwithstanding Defendant-Intervenors' statements to the contrary, the Coast Guard's ratemaking authority does not directly implicate its core mission of maritime safety, and the Final Rule should not be afforded any special deference. ECF No. 20-1, pp. 21-22. It is telling that the Coast Guard itself did not argue that any heightened deference standard applies in this case.[4] *See generally* ECF No. 21. The Coast Guard is well aware that this isolated ratemaking function stands well apart from its core mission of promoting homeland security in the maritime domain, vessel safety, law enforcement, and marine environmental protection. Defendant-Intervenors fail in their attempt to distinguish, in the deference arena, this case from their own 2014 ratemaking challenge—where they argued no special deference was due the Coast Guard. *See St. Lawrence Pilots Ass'n v. U.S. Coast Guard*, Case No. 1:14-cv-00392-TSC, ECF No. 14, p. 13 (D.D.C. Aug. 28, 2014). The

---

[4] The Coast Guard cannot re-argue these points in its final submission. Plaintiffs already raised the issue (ECF No. 18-1, pp. 17-18) and the Coast Guard already had the opportunity to respond (ECF Nos. 21, 22). *See, e.g.*, *Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 51 (D.D.C. 2015) ("it is a well-settled prudential doctrine that courts generally will not entertain new arguments first raised in a reply brief.") (internal quotations omitted); *Conservation Force v. Salazar*, 916 F. Supp. 2d 15, 22 (D.D.C. 2013) (noting that party forfeits argument made for the first time in reply brief); *Performance Contracting, Inc. v. Rapid Response Constr., Inc.*, 267 F.R.D. 422, 425 (D.D.C. 2010) ("As a general matter, it is improper for a party to raise new arguments in a reply brief because it deprives the opposing party of an opportunity to respond to them, and courts may disregard any such arguments.").

Pilot Associations argue the Court should parse what specific action the Coast Guard is taking within its ratemaking efforts to determine which deference standard should apply to that action. By this logic, because the Pilot Associations' 2014 challenge dealt specifically with the Coast Guard's use of certain financial data, no special deference was due there. The Pilot Associations make no effort to acknowledge or refute that Plaintiffs raise similarly detailed challenges in this case, going directly to the Coast Guard's determination of revenues and costs.

Further, the Pilot Associations argue "Congress expressly gave authority over ratemaking and other pilotage functions to the Coast Guard because of its experience in regulating maritime safety and commerce," but that is not entirely correct. ECF No. 20-1, p. 21. Legislative history surrounding enactment of the Great Lakes Pilotage Act ("GLPA") shows that Congress believed the establishment of statutory requirements governing Great Lakes pilotage was indeed necessary for maritime safety. *See* S. Rep. No. 86-1284 (1960), *as reprinted in* 1960 U.S.C.C.A.N. 2481, 1483. However, when the GLPA was first enacted, Congress demarcated a line between "commerce" and "safety" concerns and delegated ratemaking to the Secretary of Commerce, *not* the Coast Guard, which, at that time, was domiciled in the Department of Treasury. Public Law 86-555 at § 5(a), 74 Stat. 25 (1960) (defining "Secretary" as the "Secretary of Commerce" and stating that "The Secretary is authorized and directed to establish by regulations the rates, charges, and any other conditions or terms for services performed by registered pilots to meet the provisions of this Act."). Congress recognized the Coast Guard's traditional safety and navigation purview was implicated to the extent it authorized the Coast Guard to retain control over "matters relating to a pilot's professional competency." *Id.* at § 4(a). Indeed the Act continues to grant express authority to the Coast Guard to promulgate standards of competency for pilots. 46 U.S.C. § 9303(a). However, at the time of enactment, Congress,

likely recognizing that ratemaking was outside the Coast Guard's general expertise, did *not* indicate that ratemaking implicated maritime safety to an extent that warranted placing ratemaking authority within the Coast Guard. Ratemaking shifted to the Coast Guard at some time after this, once Congress re-delegated ratemaking to the newly formed Department of Transportation and also placed the Coast Guard in that department. *See* Public Law 89-670, § 6(a)(4), 80 Stat. 937 (1966).

The Coast Guard's ratemaking efforts and oversight of pilotage in general further undermine any argument that the Coast Guard has special expertise in this arena or is entitled to any special deference. The Coast Guard has permitted pilotage monopolies. Each of the three intervenor-defendant pilot associations has sole authority to operate within the United States in one of the three Coast-Guard-created pilotage districts on the Great Lakes. 2016 Final Rule, 81 Fed. Reg. at 11,910 (discussing Coast Guard certification of a single pilotage association in each pilotage district). Within a given district, shipowners have no competitive options for pilotage services. Congress did not mandate pilotage monopolies. Congress gave the Secretary of the Department of Homeland Security power to authorize formation of pilotage pools. *See* 46 U.S.C. § 9304(a).

The pilotage monopolies are the result of administrative acts of or forebearance by the Coast Guard. Monopolies must be regulated closely, particularly when they are created by government. In the energy utility sphere, the Supreme Court has noted that utilities are "permitted to operate as monopolies because of a determination by the State that the public interest is better served by protecting them from competition." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 549–50 (1980). "This exceptional grant of power to private enterprises justifies extensive oversight on the part of the State to protect the ratepayers

from exploitation of the monopoly power through excessive rates and other forms of overreaching." *Id.*; *see also Jersey Cent. Power & Light Co. v. F.E.R.C.*, 810 F.2d 1168, 1189 (D.C. Cir. 1987) (noting that utility businesses represent a government-granted monopoly "granted to the utility in exchange for a regime of intensive regulation," and that "ratepayers are afforded universal, non-discriminatory service and protection from monopolistic profits through political control over an economic enterprise.").

An overarching frustration for the Plaintiffs as ratepayers or costs-bearers in this system is the general passivity, lack of inquiry, and institutional unwillingness of the Coast Guard to exert the kind of "extensive oversight" into all aspects of the pilotage monopoly of the Great Lakes. The Coast Guard does absolutely nothing to control how each pilotage association distributes money to its own pilots. In fact, in the Final Rule, the Coast Guard simultaneously finds that revenue and rates must be increased substantially, but then expressly disavows control over how each pilotage association distributes that revenue to individual pilots. *See* 2016 Final Rule, 81 Fed. Reg. 11,910.[5] The Coast Guard's acquiescence in the pilotage monopolies, substantially increasing pilotage cost to ratepayers, coupled with disinterest in and disavowal of the internal compensation practices of the pilotage associations is, at best, a most rudimentary and dysfunctional regulatory program. There is a substantial likelihood that at least some portion of pilotage retention and compensation issues, to the extent they exist, are caused by the internal dynamics of the three pilot associations, not some overarching flaw in a system that, as of 2016,

---

[5] The Coast Guard puts it this way in the Final Rule:

We certify a private association to operate a pool of pilots in each district. We set rates that each association may charge vessel owners and operators, but we do not control the actual compensation each pilot receives. The actual compensation is a function of vessel traffic in the system and is determined by each association, which has its own business structure and compensation system.

*See* 2016 Final Rule, 81 Fed. Reg. 11,910.

aims to compensate individual pilots more than $326,000 annually for a nine month, 180 work-day shipping season.

There is no legitimate argument that the Final Rule warrants some special, heightened deference because its defenders and beneficiaries now seek to wrap the Rule in a "safety" label. The APA's "arbitrary and capricious" standard is a high bar for parties seeking review of agency action. However, the fundamental requirement is that an agency's process and result must be reasonable. Here, the Coast Guard failed the "substantial evidence" standard by failing to support its conclusions with record evidence in the Final Rule. Neither the agency nor the Pilots' later rationalizations can remedy that error.

### III.   Argument

#### A. The Coast Guard Cannot Simply Disregard The Calculable, Real World Impacts Of The Weighting Factor On Pilotage Costs.

The Coast Guard's ratemaking methodology is ultimately revenue-based. It determines hourly pilotage rates at step seven of its eight-step methodology by dividing each association's needed revenue (a figure calculated at step six) by the total number of estimated pilotage hours (a figure calculated at step three). Ratepayers, however, pay pilotage fees calculated by multiplying the rate by a weighting factor between 1.0 and 1.45, based on vessel size.[6] Actual pilotage costs to ratepayers therefore substantially exceed the calculations used in the methodology. The Coast Guard's failure to account for weighting factors in its projections substantially understates the revenues that a given rate will generate. This is, at root, simple arithmetic. Plaintiffs argue that the Coast Guard's APA violation with respect to the weighting factor is three-fold. The Coast Guard: (1) failed to account for a relevant factor; (2) failed to properly address Plaintiffs'

---

[6] "Weighting factors are multipliers based on the size of a ship and are used in determining actual charges for pilotage service." Great Lakes Pilotage Rates—2014 Annual Review and Adjustment, 78 Fed. Reg. 48,374, 48,376 (NPRM for the 2014 navigation season). *See* 46 C.F.R. § 401.400.

comments regarding the weighting factor; and (3) failed to articulate why it chose to disregard the weighting factor even though it had taken account of the weighting factor previously. The Coast Guard and Pilot Associations' rationalizations for this fundamental error cannot overcome the arithmetic that actually determines the ratepayers' costs.

First, the Coast Guard argues that it properly "declined to consider the weighting factors in calculating the base hourly rate because the actual revenue produced depends on many factors which cannot be accurately predicted at the time of the ratemaking." ECF No. 21, p. 16 (citing 81 Fed. Reg. at 11,923). Whatever the problem of predicting certain factors in the calculus, a factor that can be accurately predicted is the size of vessels entering the Great Lakes.[7] Plaintiffs were able to calculate an average weighting factor from public source information for the prior years. The Coast Guard is no less capable of similar calculations.

> This is the entire Coast Guard discussion of the weighting factor in the Final Rule:
>
> Given the high variability from year to year in the numbers and types of vessels requiring pilotage, we have never considered weighting factors in projecting revenue projections of the rate. We do not consider specific routes in the rulemaking, only the needed revenue for pilot associations to provide safe, efficient and reliable service. Our comparison of needed revenue from year to year reflects the overall cost of the pilotage system; some routes may see higher increases than others depending on factors including weather, traffic, cargo, and destination.

2016 Final Rule, 81 Fed. Reg. at 11,923.

---

[7] The Coast Guard cannot refuse to acknowledge and account for the weighting factor, with its large potential impact on ratepayers' costs and on pilot revenue, with unsupported argument that revenue ultimately depends on many difficult to predict factors. The Pilot Associations support their weighting factor argument with a reference to the Final Rule for a proposition that cannot be found there. According to the Pilot Associations, the Coast Guard found, at 81 Fed. Reg. at 11,910, that including the effect of the weighting factor would result in undercompensation of pilots. ECF No. 20-1, p. 24. However, the *only* rationale in the Final Rule for the Coast Guard's decision not to take account of the weighting factor is the language excerpted above.

The Coast Guard argues that it has not historically included weighting factors in calculating revenue figures and that past ratemakings had resulted in an under-collection of pilot revenue.[8] According to the Coast Guard's brief, the Final Rule notes record support for this under-collection proposition. However, the Final Rule only states: "[t]he Director of Great Lakes Pilotage has reviewed *his* data for 2005 through 2014 and estimates that, over this period, the three pilotage associations cumulatively fell short of revenue projections by $20 million." ECF No. 21, p. 16 (citing 2016 Final Rule at 11,910) (emphasis added). The Director's "data" are not included or even referenced in the Final Rule. A passing reference to "data" is not adequate support for a legal conclusion in notice and comment rulemaking. *See City of Brookings Mun. Telephone Co. v. F.C.C.*, 822 F.2d 1153, 1168 (D.C. Cir. 1987) (noting agency failed to engage in reasoned decisionmaking when, in adoption of a new process, "omissions in data and methodology appear to have made it impossible to reproduce how…concepts [were translated] into hard figures"); *Aeron Marine Shipping Co. v. U.S.*, 695 F.2d 567, 577-80 (D.C. Cir. 1982) (finding agency decision arbitrary and capricious because it lacked adequate factual predicate and "made key assumptions without supporting evidence.").

All parties to this litigation can no doubt agree that actual revenues generated in any given season are influenced by several variables. The significant variable however, is probably the most difficult to predict – the overall volume of vessel traffic requiring pilotage. The oft-cited

---

[8] The Pilot Associations similarly argue that "the Coast Guard has consistently determined not to use weighting factors in predicting revenues" and "rate levels have resulted in a significant *under*-collection of pilotage revenues in virtually every previous year." ECF No. 20-1, p. 22. Again, the Coast Guard only created the current weighting factor system for the 2014 shipping season. There is no support in the Final Rule for the proposition that in the three shipping seasons in which the new weighting factor system has been applied to actual pilotage rates, actual revenue consistently fell short of projected revenue. To the contrary, in 2014—the only one of those years for which data was available as of the Final Rule—actual revenues exceeded projected revenues by more than $5 million. *Compare* Final Rule, 81 Fed. Reg. 11,937 *with* Great Lakes Pilotage Rates—2014 Annual Review and Adjustment, 79 Fed. Reg. 12,103-04 (March 4, 2014). While the Pilot Associations continuously stress increased shipping volume for the 2014 increase, it was also the result of the weighting factor change.

cumulative shortfall in revenue prior to 2014 correlates directly with the global economic downturn that commenced in the 2007-2008 period. Vessel weighting factors, however, are calculable and their constancy over time can be assayed by the Coast Guard. The unpredictability of other variables such as weather or global economic collapse does not relieve the Coast Guard from its obligation to apply reasoned decision-making to relevant factors that are measurable and calculable.

The Coast Guard also argues that it has not considered weighting factors in its methodology previously, and so it has not improperly deviated from past agency practice. Canada first adopted its current weighting factor system in 2008. 78 Fed. Reg. 48,374, 48,376. The Coast Guard first adopted that same weighting factor system in 2014.[9] *Id.* There is no dispute that in one of those two years since this change, the Coast Guard explicitly acknowledged the positive net effect that application of the weighting factor would have on pilot association revenues. *Id.* ("Based on historic traffic levels, we believe this weighting factor adjustment will increase U.S. pilot association revenues by approximately 6 to 7.5 percent."). More importantly, this statement in 2013—projecting the positive effect of the weighting factor to a fraction of a percent—is directly at odds with the Coast Guard's statement in the Final Rule, just two years later, that it has "never" included a weighting factor because of its "high variability." The Coast Guard could—and has—determined the effect of the weighting factor and taken account of it during ratemaking efforts.

---

[9] While the Coast Guard has long applied *some* form of the weighting factor to pilotage rates, in 2014 it substantially increased the weighting factor's net effect on pilotage fees and total pilotage revenue by increasing pilotage fees by 15% for vessels with pilotage units between 50 and 129. *See* 46 C.F.R. § 401.400. Many vessels fall in this weighting factor range. *See* A.R. at 1209 (noting weighting factor change will effect approximate 6% increase in revenue); A.R. at 219 (noting vessels are getting larger).

The impact of the weighting factor on ratepayer costs is inescapable. The Coast Guard now states that it cannot account for weighting factors because the overall demand (*i.e.*, the number of vessels that are required to take pilots) for pilotage services does not always meet projected demand, and, historically, actual revenue and projected revenue rarely match. ECF No. 21, p. 17. While the Coast Guard said in the Final Rule that it saw "potential merit" in Plaintiffs' comments about the weighting factor, simply stating that it would "take it under advisement" does not pass APA muster.[10] *See Ass'n of Private Sector Coll. & Univ. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (finding agency's "failure to address [ ] comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense.") (internal quotation omitted); *Action on Smoking & Health v. Civil Aeronautics Bd.,* 699 F.2d 1209 (D.C. Cir. 1983) (finding agency rulemaking violated APA because it failed to adequately address viable alternatives proposed in comments). This is particularly so when, as indicated in Plaintiffs' opening brief, the Coast Guard had the ability to determine an average weighting factor and to gauge its constancy over time from a variety of sources, including pilot billing documents that it routinely collects and Ship Notification Arrival System ("SANS") data. The Coast Guard used SANS data elsewhere in the Final Rule, and thus clearly avails itself of that source of information. The only uncontroverted data on the weighting factor in the record, provided by Plaintiffs, stated that the average weighting factor for all vessels in 2014 was 1.28. The Coast Guard could have readily validated that value from its own sources.

---

[10] The Pilot Associations raise a similar argument that "[t]he Coast Guard expressly considered the weighting factors and made a reasoned decision to continue its longstanding practice of estimating revenues without reference to those factors." ECF No. 20-1, p. 22. Again, the Coast Guard substantially increased the net cost impact on ratepayers of the weighting factor for the 2014 ratemaking—there is nothing "longstanding" here. More importantly, there is nothing "reasoned" about the Coast Guard's acknowledgement in 2013 that it could calculate the effect of the weighting factors on pilotage revenues and its statement in the Final Rule that it cannot and never has.

**B.   The Final Rule Fails To Account For Over Or Under Collection Of Revenue, Improperly Deviating From Prior Agency Practice, And Relies On A Demonstrably And Materially Inaccurate Figure To Support The 2016 Rate Increase.**

Plaintiffs commented in the NPRM process that the Coast Guard should maintain "accurate, current operational data" to allow a "truing up" of the "disparities between projections and actual data for a given period [that] yield[s] excess revenue collections." A.R. at 284. This is a material, significant comment that the Coast Guard was obligated to address. As acknowledged above, revenue projections do not historically mirror actual revenue. A failure to account for overages or "underages" seriously compounds ratemaking errors when measured across years, cumulatively. The Coast Guard failed entirely to address Plaintiffs' request to true up projected and actual revenues, and failed to even acknowledge the comment in the Final Rule. *See generally* 2016 Final Rule, 81 Fed. Reg. at 11,923. Further, the Coast Guard's decision not to account for the differences between actual and projected revenue constitutes an APA-violative departure from past agency practice. Finally, the Coast Guard did not, contrary to its statement in the Final Rule, provide "extensive evidence in support of [its] analysis of association expenses and revenues." *Id.*

The Coast Guard notes in its cross-motion papers that while the NPRM used a seriously understated 2014 revenue figure, the Final Rule "accurately noted that the audited, actual revenue across the entire system for 2014 was $16,875,073." ECF No. 21, p. 18 (citing A.R. at 1364). However, while the Coast Guard noted the correct, audited figure in table 31, its corollary statement that "[t]he last full year for which we have reported and audited financial information for the pilot association expenses is 2014, as discussed in Section VII of this preamble," is incorrect. A.R. at 1364. There is absolutely no reference in Section VII to the correct 2014 revenue figure, and there is absolutely no indication in the Final Rule that the Coast Guard

15

actually used or took account of the $5.7 million over-realization in 2014 when it decided to significantly raise the 2016 rates. The Final Rule supports Plaintiffs' position that the Coast Guard did *not* take account of the audited 2014 revenue figures. The Coast Guard stated in the Final Rule that it "sets base rates for 2016 using pilot association expense data from 2013, the last full year for which reported and audited financial information is available." A.R. 1339 (emphasis added). As the Coast Guard notes in both its cross-motion and in the Final Rule, it *did* have audited financials for 2014, and those financials showed the Coast Guard 2014 revenue projections underestimated 2014 revenues by $5.7 million, even though it had accurate, real time data in its possession, and then used that incorrect figure to justify substantial rate increases in the Final Rule. *Id.* In short, the Coast Guard's 2016 Final Rule is based, in a material part, on a demonstrably wrong figure that significantly disfavors Plaintiffs.

Nothing in the Pilot Associations' analysis changes this calculus. The Pilot Associations implicitly acknowledge the Coast Guard's error, but argue that the 2014 target revenue figure (relied upon by the Coast Guard to extrapolate the 2016 rate increase) was "too low to begin with" and later overturned by this Court. *See* ECF No. 20-1, pp. 25-26. This is beside the point of Plaintiffs' APA challenge. The Coast Guard based its 2016 rate increase on the mistaken position that the 2014 shipping season had failed to yield target revenue rates for that year. The Pilot Associations then recognize that the actual, audited 2014 figures reflect that "2014 was far busier than projected and the pilots had to work harder." *Id.* Plaintiffs are not ignoring the fact that these actual revenues were based on substantially increased pilot workloads. *Id.* at 27. The Plaintiffs' APA concern is that the Coast Guard erred in relying on understated 2014 revenue numbers to support a 2016 rate increase, particularly when use of the available, audited financials would very clearly work to diminish the rate calculations espoused in the Final Rule.

The Pilot Associations' "we had to work harder" argument raises another point. The entire ratemaking exercise yields a base hourly pilotage rate. There is no room for the Pilot Associations to argue, as they do, that they had to "put in these extra hours for free." ECF No. 20-1, p. 27. Pilots are paid on an hourly basis. The base hourly rate calculated via the ratemaking does not even reflect the application of weighting factors, which increase actual pilotage invoices by some 28% on average, based on 2014 vessel data. ECF No. 18-1, pp. 22-23. Both the Pilot Associations and the Coast Guard ultimately advocate for the new methodology, which, like the old methodology, yields base hourly pilotage rates. However, when those methodologies do not yield revenue to their liking, they fail to recognize that the issue is a change in demand for pilotage services and instead push for increased projected revenue targets, and increased rates. Ultimately, Great Lakes pilotage is a business, albeit a highly insulated one. The Coast Guard's ratemaking system yields an hourly rate rather than a mandated compensation. That levels of pilotage activity will vary with volumes of pilotage traffic is an unavoidable reality.

This issue of the Coast Guard's wrongful reliance on unaudited and underestimated 2014 revenue figures underscores the inadequacy of a ratemaking system that never looks to historical discrepancies to "true up" its future ratemaking efforts. The Coast Guard argues in its cross-motion that Plaintiffs somehow failed to highlight their "truing up" comment to the extent that it warranted attention by the Coast Guard. No case is cited for that proposition—that an agency is somehow excused from evaluating a relevant factor because a commenter did not place an acceptable emphasis on its importance.[11] This is not the standard—a failure to address a material

---

[11] The Coast Guard also includes argument that Plaintiffs' comment failed to explain how a refund mechanism would work or "the specific authority for the Coast Guard to establish such a mechanism." While the Plaintiffs' original comment did make reference to a "refund", Plaintiffs are *not* seeking payment of money from the Pilots back into the system, or to ratepayers. Instead, Plaintiffs are asking that the Coast Guard take account of how its prior ratemakings did or did not achieve their stated goals (i.e., compare actual to projected revenues, using audited financials) and, where required, to make forward-

comment is one of many ways that an agency may fail to consider a relevant factor. It is not the only way. *See Lilliputian Sys., Inc. v. Pipeline & Hazardous Materials Safety Admin.*, 741 F.3d 1309, 1312 (D.C. Cir. 2014) ("An agency's failure to respond to relevant and significant public comments generally demonstrates that the agency's decision was not based on a consideration of the relevant factors.") (internal quotation omitted); *Sprint Corp. v. FCC*, 331 F.3d 952, 960 (D.C. Cir. 2003) (noting agency must respond to comments that raise significant problems "in order to refute a conclusion that the agency's decision was not based on a consideration of the relevant factors.") (internal quotation omitted).

Even if the Coast Guard could successfully argue that Plaintiffs failed to properly raise the issue of the Coast Guard deviating from its past practices, Plaintiffs have not waived their right to raise the issue here. Defendants fail to note the exception to this general rule that when, as is the case here, Plaintiffs could not have known of the issue prior to the rulemaking. While it is true that, as a general matter, "a party must initially present its comments to the [relevant] agency during the rulemaking in order for the court to consider the issue." *Tex Tin Corp. v. EPA*, 935 F.2d 1321, 1323 (D.C. Cir. 1991). That rule is inapplicable where a party "had no way to raise [an] argument until the [agency] issued its final rule." *Estes v. U.S. Dep't of the Treasury*, No. 1:16-CV-00450 (CRC), 2016 WL 6956594, at *13 (D.D.C. Nov. 28, 2016) (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1079 (D.C. Cir. 2009)). In this case, the 2014 audited financials were not posted to the 2016 docket until December 21, 2015 after the close of the notice and comment period on December 9th, 2015. Moreover, Plaintiffs did not,

---

looking adjustments that take account of actual results. This may or may not require crediting ratepayers or Pilots for overages or under-ages in the prior year, and that point is secondary to the greater point that the Coast Guard inadequately takes account of whether it has achieved its past revenue-generating objectives.

and could not, have known how the Coast Guard would treat any past overages/underages

discovered by reference to past audited financials until the Final Rule was published.

The Coast Guard has taken account of differences between actual and projected revenue

in the past. Just one year previously, the Coast Guard, at the Pilots' urging, "adjust[ed its] rate

increase to 10 percent across all districts to begin aligning actual and projected revenues." *See*

Great Lakes Pilotage Rates—2015 Annual Review and Adjustment, 80 Fed. Reg. at 10,368

(Final Rule). The Coast Guard acknowledges this occurred but argues what actually happened in

2015 was "more complex" and this is somehow excuses the deviation from past practice. ECF

No. 21, p. 19. It does not. By the Coast Guard's own admission, application of its ratemaking

methodology yielded 2015 pilotage rates approximately twelve percent lower than the 2014

rates. However, the Coast Guard then decided to use its discretion to *increase* rates by ten

percent, because "recently completed independent audits of pilot association revenues detail a

significant gap between revenues projected by the Coast Guard and those actually collected by

the pilot associations." *Id.* (quoting 2015 Final Rule, 80 Fed. Reg. at 10,381). This raises two

noteworthy points: (1) there is nothing reasonable about application of a ratemaking system that

the Coast Guard simply ignores; and (2) in 2015 the Coast Guard very clearly *did* take account of

whether its prior projected revenues met actual revenues and then made a corresponding rate

adjustment, but it did *not* do so in the Final Rule.[12] Defendants argue that the Coast Guard

---

[12] The Coast Guard argues in its summary judgment brief that it did not make a downward adjustment to
2016 rates based on the 2014 actual versus projected revenue surplus because: (1) the new methodology
applied in 2016 and thus no discretionary adjustment was necessary, even though the new methodology
also includes the discretionary adjustment step; and (2) the 2014 numbers were the result of unusually
high demand in that season. Again, the Coast Guard's position would have high demand seasons yield
higher revenues for pilots, but use lower demand seasons to increase pilots' revenues—this is simply
inconsistent, irrational, and unsustainable for ratepayers. In any event, both these stated bases are nowhere
to be found in the Final Rule, and an agency's post-hoc rationalizations are not enough to sustain agency
action. *See Mayo*, No. CV 14-1751 (RC), 2016 WL 4083308, at *5 ("The *post hoc* rationalization rule

increased rates to "produce adequate revenue in 2015, not to correct for a shortfall of revenue in the past." ECF No. 21, p. 20. But the 2015 Final Rule is replete with clear statements that the Coast Guard used its Step 7 discretion to raise rates specifically because of the revenue gap identified by analysis of the 2013 audited financials.[13] Moreover, Plaintiffs do not claim that the Coast Guard's past practice was to retroactively correct for past revenue shortfalls, but rather to "adjust[] rates to reflect its miscalculation of actual revenues in previous years." ECF No. 1, p. 13; *see also* ECF No. 18-1, p. 26 ("quite clearly, in the past, when crafting the then-current year's target revenue numbers, the Coast Guard considered and took into account whether and to what extent a prior year's actual revenue differed from target revenue."). The Final Rule fails to even take account of how it performed in prior years when setting rates prospectively.

### C. The Coast Guard's Decision To Use A Peak Staffing Model Violates The APA Because It Is Unsupported By Adequate Evidence. The Coast Guard Failed To Address Plaintiffs' Comments On This Point.

The Coast Guard has not addressed the issues raised in Plaintiffs' summary judgment motion in any substantial way. Plaintiffs identified the APA issue as "fail[ure] to explain why ratepayers should incur the substantial cost of a peak demand model, especially where comments

---

prohibits a court from upholding an agency's decision based on rationalizations offered for the first time in litigation affidavits and arguments of counsel.") (internal quotation omitted).

[13] *See* Great Lakes Pilotage Rates – 2015 Annual Review and Adjustment, 80 Fed. Reg. at 10,365 ("[T]he Coast Guard exercises the discretion provided in Step 7 of the Appendix A methodology. The result in an upward adjustment to close the gap between revenues projected by this rulemaking and those collected by the pilot associations."); 80 Fed. Reg. at 10,367 ("[W]e seek to actively close the confirmed gap between pilot association collections and Coast Guard projections by increasing the rates."); *Id.* ("Since the actual revenues collected by the associations fall well short of our projections, we are utilizing our Step 7 discretion to increase rates in all areas by 10 percent."); 80 Fed. Reg. at 10,368 ("We … have adjusted our rate increases by 10 percent across all districts to begin aligning actual and projected revenues."); 80 Fed. Reg. at 10,381 ("We decline to impose [a rate] decrease because recently completed independent audits of pilot association revenues detail a significant gap between revenues projected by the Coast Guard and those actually collected by the pilot associations."); *Id.* ([W]e rely on the discretionary authority we have under Step 7 to further adjust rates and begin closing the gap between revenues projected by Coast Guard and those collected by the pilot associations.").

questioned its necessity and suggested viable alternatives not addressed by the Agency." ECF

No. 18-1, p. 28. The Coast Guard attempts to reframe Plaintiffs' desire for reasoned decision

making for a costly peak-demand staffing model into a broader complaint about the number of

pilots required under the Final Rule. ECF No. 21, p. 22.

Plaintiffs note that the Coast Guard's argument regarding the true cost of a peak-staffing

model provides additional support for Plaintiffs' position that the cost does not justify the benefit

to ratepayers. The Coast Guard argues that Plaintiffs' cost calculations are incorrect, claiming

that the cost of the peak-staffing model would be approximately $600,000 to $2 million, and not

the $6 million claimed by Plaintiffs. ECF No. 21, p. 22. It contends that because the 2016 rates

are set using only an increase from 36 to 42 pilots, the cost of a peak-demand model in 2016

would be "one-tenth to one-third of Plaintiffs' claim." ECF No. 21, p. 23. First, the Coast Guard

estimates of 2016 costs do not account for the cost to train six additional pilots, the increase in

pilot positions that the Coast Guard authorized in 2016. *See* 81 Fed. Reg. at 11,932, 11,933.

Second, and more importantly, the Coast Guard attempts to obscure the annual cost increase of

the peak-demand-staffing model by referencing costs in a single year. Plaintiffs are concerned

about the overall costs of the change, and their calculations referenced the overall annual cost of

staffing to meet the target number of pilots, 54 pilots. (ECF No. 18-1, p. 30) ("This results in

*additional annual costs* to ratepayers of nearly $6 million.") (emphasis added). This $6 million

annual cost to ratepayers was not hypothetical, as the Coast Guard stated "[o]ur goal is to help

the pilot associations close the gap between needed pilots and working pilots as soon as

possible." 80 Fed. Reg. 54,496. Whether the Coast Guard's overarching goal of staffing to meet

peak demand and adding 16 pilots to the pilot association roster is accomplished in 2016 or

2020, once those pilots are hired, they will add a significant cost to ratepayers on an annual basis.

Further, the numbers of pilots will not be readily diminished if demand for services is reduced by the many external factors that can affect shipping volumes.

The Coast Guard attempts to reframe the APA violation as a question of whether it was reasonable for the Coast Guard to change the methodology it used to calculate the number of pilots needed. While Plaintiffs agree that they can find many faults in the methodology used to calculate the number of pilots needed, Plaintiffs specifically allege that the Coast Guard failed to provide a reasoned explanation for its use of a peak-demand staffing model that yielded a response to occasional delay issues that far exceed the costs of those delays. The Coast Guard argues that it had "multiple objectives and bases for calculating pilot demand other than simply staffing to avoid delays during peak periods." ECF No. 21, p. 23. Defendant's points are irrelevant to the issue of whether the Coast Guard used reasoned judgment in implementing its expensive peak-demand approach.

The Coast Guard points to three irrelevant after-the-fact rationalizations to explain non-delay related reasons for its use of the peak-demand staffing model. The Coast Guard posits that (1) "By switching to a rolling-average of the past ten years' demand under the 2016 rate methodology, the Coast Guard will be able to forecast demand based on more objective data and, in the process, minimize the potential for wide fluctuations in demand projections" ECF No. 21, p. 23; (2) "By using pilot cycle time, the Coast Guard is likely better able to assess the number of pilots required to meet expected demand" ECF No. 21, p. 24; and (3) "the peak staffing demand model is designed to provide the pilots days off for recuperative rest during non-peak months in order to combat chronic fatigue issues in accordance with National Transportation Safety Board (NTSB) recommendation." *Id.* Neither of the first two factors, rolling-average of demand and cycle time to calculate the number of pilots needed, explain or even relate to why a peak-demand

22

staffing model is necessary. The Coast Guard did not raise those factors in the NPRM or the Final Rule to support its conclusion that peak-demand staffing was necessary. These explanations are clearly retrospective and were not subject to public comment or inquiry as the rule was being framed. *See Mayo*, No. CV 14-1751 (RC), 2016 WL 4083308, at *5.

Plaintiffs are then left with the final non-delay explanation for the use of the peak-staffing model. The Coast Guard argues that the peak-demand staffing model allows it to "combat chronic fatigue issues in accordance with [NTSB] recommendation." ECF No. 21, p. 24. But the 2016 NPRM does not mention NTSB recommendations in support of a peak-staffing model or for any other reason. Only in the 2016 Final Rule does the Coast Guard provide this new justification for using its peak-demand staffing model. It states that such a model is "essential if we are to provide the recuperative monthly rest period recommended by the NTSB in the interest of safety." 81 Fed. Reg. at 11,922. The Coast Guard does not refer to the NTSB recommendations on the docket. Perhaps with good reason, because NTSB did not recommend ten days of recuperative rest.[14]

Current NTSB guidelines do not require that pilots receive 10 days of recuperative rest each month. In June of 2015, the NTSB issued a letter that urged the Coast Guard to implement fatigue mitigation and prevention programs on the Great Lakes. *See* supra, n. 14. NTSB suggested that USCG inform pilots about fatigue and provide sufficient rest within a 24-hour period and avoid disrupting the pilots' circadian rhythms. *See id*. USCG replied that it was

---

[14] NTSB's relevant recommendations to the Coast Guard are available at the following websites: http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-005; http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-006; and http://ntsb.gov/_layouts/ntsb.recsearch/Recommendation.aspx?Rec=M-15-007. Plaintiffs ask that the court take judicial notice of these documents. While it is not included in the administrative record, they are publicly available and the Coast Guard indicated they relied on this information in the Final Rule. *See Pharm. Research and Mfrs. Of Am. v. U.S. Dep't of Health and Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (stating that "[c]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.").

updating several of its policies and introduced a proposal to require that pilots receive 10-days of recuperative rest per month. *See id.* NTSB did not require or recommend 10-days of recuperative rest, but rather responded that it found USCG's overall proposal acceptable. *See id.* This exchange does not provide justification for a peak-demand staffing model. The 10-day recuperative rest figure appears not to be the result of rigorous, objective study, and certainly was not imposed by the NTSB. It rather appears to be a number pulled from somewhere, and not subjected to scientific validation, that somehow got embedded in the Coast Guard assumptions and communicated to NTSB by the agency without having been the subject of study or public comment.

Furthermore, it seems illogical that the imposition of peak-staffing would be required to provide rest periods during non-peak months when demand levels are lower and pilots have more opportunities to build into their schedules periods of recuperative rest. Because NTSB's recommendations were not on the docket, Plaintiffs and other stakeholders could not assess or comment on whether a peak-demand staffing model is necessary to manage pilot fatigue.

The Coast Guard's submissions offer no explanation of its justification for the main issue raised by plaintiff – that the peak-demand staffing is not justified by the cost. In the 2016 NPRM, the Coast Guard dedicates one lonely sentence to its rationale for peak-demand staffing, stating that, "as recommended by GLPAC, we would identify the number of pilots needed to meet each shipping season's peak pilotage demand periods without interruption to service." Great Lakes Pilotage Rates – 2016 Annual Review and Adjustment, 80 Fed. Reg. at 54,489 . In the Final Rule, the Coast Guard repeats its idea that peak-demand staffing is "essential for reducing traffic delays during peak periods." 81 Fed. Reg. at 11,922. However, no industry stakeholders have requested or advocated a zero-delay system. When the GLPAC considered the question of staffing to meet

24

peak-demand, it noted that industry accepts and is comfortable with some delay in the Great

Lakes system. *See* A.R. at 773-74 (describing "reliability" as allowing a certain amount of

delay). GLPAC members voted to incorporate a seasonal work standard to determine the number

of pilots needed, but tabled the discussion of peak-demand staffing. *See id*. The Coast Guard's

position is simply unsupported.

The Coast Guard's opposition motion also neglects to defend its failure to address

proposed alternatives provided by Plaintiffs during the notice and comment period. Plaintiffs

recommended that the Coast Guard cross-qualify pilots among districts as an alternative to hiring

pilots to handle peaks with zero-delays. The Coast Guard did not address that suggestion in the

Final Rule, instead it inaccurately stated that "[t]he coalition did not propose any other

alternatives for our consideration and we have not identified such alternatives." 81 Fed. Reg. at

11,922. The Coast Guard was required to consider this viable alternative in the ratemaking

process, and it has not provided any rationale that would relieve it of responsibility to have done

so. *See Louisiana Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080–81

(D.C. Cir. 2003) (finding APA violation because agency failed to respond to comment that, if

true, would require a change in the proposed rule)

Finally, Plaintiffs note that the Coast Guard argues that the 2017 ratemaking "proposed a

change in its calculation of pilot demand which if implemented will moot some of Plaintiffs

arguments with regard to this issue." ECF No. 21 at 22. While Plaintiffs welcome any evolution

of the Coast Guard's examination of issues relating to proper pilot staffing, the 2017 ratemaking

is currently pending before the Coast Guard as a proposed rule the content of the Final Rule is

not known, and a final rule may well not be in place prior to resolution by this Court of these

issues.

Plaintiffs take the Coast Guard's re-iteration of this issue in the 2017 Rulemaking as implicit validation of their concern over the peak-demand staffing model in 2016, but 2016 rates were calculated on the 2016 methodology, and it is the setting of those rates that has brought the parties before this court.

### D. The Coast Guard's Decision To Set U.S. Pilot Target Compensation At A Rate 10 Percent Above Projected 2016 Canadian Compensation Is Arbitrary And Unreasonable.

One of the stated reasons for adopting the new methodology espoused in the Final Rule is that the Coast Guard's prior methodology used union data on the compensation for U.S. merchant marine masters and mates as a benchmark for pilotage compensation, but those data had been deemed proprietary and were no longer available to the Coast Guard. A.R. at 1335. The Coast Guard analyzed a variety of possible new benchmarks, and ultimately chose to adopt the compensation of Canadian Great Lakes pilots, but then to revise that benchmark figure ten percent upward, "in recognition of the different benefits available to Canadian pilots and their U.S. counterparts." A.R. at 1342. Plaintiffs generally believe that the Coast Guard should return to using compensation of U.S. masters and mates as the most reliable and accurate guidepost for U.S. pilot compensation, given the similarity of functions performed by pilots on foreign vessels entering the Great Lakes and those of U.S. Mates and Masters on the dedicated Lakes vessels that do not require pilots.

However, Plaintiffs' Complaint specifically alleges that the Coast Guard "failed to provide reasoned decision making when it set U.S. pilot target compensation at a rate of 10 percent above projected 2016 Canadian compensation figures." ECF No. 1, p. 16. The APA error here is two-fold: (1) the decision to even choose the Canadian pilots' compensation as a benchmark was arbitrary and capricious; and (2) the decision to then add ten percent to that benchmark to arrive at a U.S. figure is also arbitrary and capricious.

As explained in Plaintiffs' opening brief, Plaintiffs' comments on the NPRM noted the complexity of making comparisons between Canadian and U.S. pilotage compensation levels. ECF No. 18-1, p. 35; A.R. at 308. There are key differences between the functions and compensation of U.S. pilots and their Canadian counterparts that make application of a Canadian pilot benchmark unreasonable, particularly where there are other, better benchmarks. As noted in Plaintiffs' comments to the Rulemaking docket:

> Canadian pilots perform a larger proportion of their services in designated waters; U.S. pilots in the Great Lakes often operate vessels over long stretches of undesignated waters that are not particularly challenging from a navigational or pilotage standpoint. Unlike pilots in designated waters, pilots in undesignated waters are only required to be "available" to the Master. *See* 46 U.S.C. § 9302. Service in undesignated waters is less demanding as most of their time on board does not require active pilotage, a fact that has been recognized in previous ratemakings.

A.R. at 308.

Plaintiffs also noted that Canadian pilots are government employees, and that Canada has its own unique social programs, tax regime, and currency. A.R. at 319. The Coast Guard acknowledged in the Final Rule that it "received several comments on the benchmark and benchmark adjustment" A.R. at 1342, and that Plaintiffs commented that use of the Canadian benchmark was an abuse of discretion, "because it ignores the facts that Canadian pilots perform more work in designated waters than U.S. pilots do, and that they are government employees." *Id.*

The Final Rule did not address these concerns adequately, stating only that the Coast Guard continued to view Canadian pilots as a proper benchmark because they perform "comparable work under comparable circumstances" without further analysis or discussion. The Coast Guard rejected Plaintiffs' position that Canadian pilots are not a proper benchmark "[f]or reasons described above." A.R. at 1342. There are no "reasons described above" in the Final

Rule that relate to the Coast Guard's decision to use Canadian pilots as a benchmark; the reasoning above applies only to the Coast Guard's decision to apply a ten percent adder to the Canadian pilot compensation benchmark. *see id.* These are two wholly separate issues. This failure to address Plaintiffs' material comments violates the APA. *Louisiana Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080–81 (D.C. Cir. 2003) (finding APA violation because agency failed to respond to comment that, if true, would require a change in the proposed rule); *Ass'n of Private Sector Coll. & Univ. v. Duncan*, 681 F.3d 427, 449 (D.C. Cir. 2012) (finding agency's "failure to address [ ] comments, or at best its attempt to address them in a conclusory manner, is fatal to its defense.") (internal quotation omitted); *Action on Smoking & Health,* 699 F.2d at 1209 (finding agency rulemaking violated APA because it failed to adequately address viable alternatives proposed in comments).

The decision to add ten percent to the Canadian pilot compensation benchmark to arrive at a U.S. figure is arbitrary and capricious.[15] As Plaintiffs made clear in their opening memorandum, the ten percent figure is essentially drawn from thin air, from comments made at a Great Lakes Pilotage Advisory Committee ("GLPAC") meeting.[16] ECF No. 18-1, pp. 34-35. The Coast Guard acknowledges this in the Final Rule and its cross-motion. ECF No. 21, pp. 26; 2016 Final Rule 81 Fed. Reg. at 11,915 ("We acknowledge that this adjustment is an approximation

---

[15] The Pilots argue that Plaintiffs do not contest there are differences that should be taken into account between U.S. and Canadian pilot compensation and that this somehow supports the ten percent adder. ECF No. 20-1, p. 32. While Plaintiffs absolutely embrace the notion that there are numerous and significant differences between U.S. and Canadian pilotage that make economic and financial comparisons complex and prone to error, in Plaintiffs' view those difference support use of another benchmark altogether, or, at a minimum, deletion or decrease of the ten percent adder. A.R. at 307-09.

[16] The Pilots argue that Plaintiffs offered no support for their contention that GLPAC's composition favors pilot interests. ECF No. 20-1, p. 34. However, Plaintiffs noted that "direct ratepayers, non-U.S.-flag shipping interests who pay pilotage rates, are limited in their ability to serve [on GLPAC] due to advisory committee citizenship restrictions." ECF No. 18-1. Further, Plaintiffs' opening brief cited their initial comments as well. *Id.* Those comments noted the current GLPAC membership in detail, including that the Coast Guard has appointed a union president to represent ports. That union includes pilot association employees. A.R. at 303-04.

based on several statements made at the 2014 GLPAC meetings[.]"). Nonetheless, the Coast

Guard argues that the ten percent number was the result of reasoned decisionmaking because the

Coast Guard was not convinced by the Pilot Associations' contention that the number should be

higher or the Plaintiffs' contention that there should be no adder at all.

However, just because the Coast Guard "split the baby" (however unevenly) on this

issue, does not mean its conclusion is APA-compliant. The decision to use the ten percent figure

was arbitrary, completely non-empirical and exhibited a lack of APA-requisite reasoned

decisionmaking. It was, literally, the result of two informal passing comments at GLPAC

meetings. ECF No. 18-1, p. 35. *See Select Specialty Hosp.-Bloomington, Inc. v. Burwell*, 757

F.3d 308, 312 (D.C. Cir. 2014) ("There are cases where an agency's failure to state its reasoning

or to adopt an intelligible decisional standard is so glaring that we can declare with confidence

that the agency action was arbitrary and capricious. This is one of them.") (internal quotation

omitted).

Canadian pilot compensation is a highly imperfect analog for U.S. pilot compensation.

Put simply, the use of that benchmark without the backing of extensive analysis constitutes lack

of reasoned decisionmaking, particularly when the Coast Guard's departure from use of union-

supplied Masters and Mates compensation data is the result of that union determining, after

many years, that its data are proprietary. That benchmark was a very good analog for pilotage

compensation—those masters and mates on U.S. vessels that do not require pilotage perform the

exact same services as the Pilots, though they also perform additional job functions and have

additional responsibilities. The Coast Guard's rulemaking record does not reflect efforts to

pursue the data, either directly with the union, or via other avenues to gain the same or similar

information. In any event, the ten percent addition to Canadian compensation was arbitrarily

plucked from two casual comments made at GLPAC meetings. It does not represent the

consensus of *any* group, or the empirical measurement of the myriad economic and financial

factors that distinguish U.S. and Canadian pilotage. The Coast Guard has provided inadequate

support for how a ten percent figure is reasonable here. Both the decision to use a Canadian pilot

benchmark and the decision to add ten percent to that benchmark are arbitrary and unreasonable

in violation of the APA.

### E.   The Final Rule Lacks Requisite Support For Its Conclusions That There Is A Pilotage Retention Problem Or That This Supposed Problem Is Caused By Inadequate Pilot Revenue.

The Coast Guard's NPRM claimed that pilot attraction and retention was an issue on the

Great Lakes, and cited this issue as a primary justification for increasing pilot revenue in the

2016 Final Rule. ECF No. 18-1, p. 36; A.R. at 3. Plaintiffs' comments noted this position was

based entirely on anecdotal comments from pilots, was not based on any empirical data, and that

retention issues, to the extent they exist, were not necessarily caused by compensation issues.

A.R. at 317. The Final Rule improperly, and in violation of the APA, included and relied upon

unsourced data about 31 pilot departures over the last eleven years to support the claimed

retention problem. 2016 Final Rule, 81 Fed. Reg. at 11,919. Plaintiffs had no opportunity to

comment on those data. Had they been offered that opportunity, Plaintiffs would have noted the

obvious issue that the departure statistics were not only unsourced, but that they also failed to

show the cause of any particular pilot's departure. The Coast Guard's failures here violate the

APA. *See Louisiana Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1080–

81 (D.C. Cir. 2003) (finding APA violation because agency failed to respond to comment that, if

true, would require a change in the proposed rule); *Judulang v. Holder*, 132 S.Ct. 476, 477

(2011) (noting that courts retain an "important role in ensuring that agencies have engaged in

reasoned decisionmaking."); *Ramaprakash v. F.A.A.*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)

(quoting *Columbia Broad. Sys, v. F.C.C.*, 454 F.2d 1018, 1027 (D.C. Cir. 1971) ("[a]n agency [must engage in] the essential requirement of reasoned decision making.").

In its cross-motion, the Coast Guard argues that the late-sprung departure numbers represent "a turnover of seventy-five percent to eighty-six percent." ECF No. 21, pp. 27-28. Apparently, the Coast Guard is gauging total departures over eleven years against the number of pilots within the system in any one given year. At best, this creative math leaves the ratepayers even less confident in the Coast Guard's ratemaking capabilities. In any event, the Coast Guard's follow-on point that this is "significant because it is unusual for pilots in the United States to leave a position as a pilot to take another position in the maritime industry," is not borne out by even its own unsupported statistics. ECF No. 21, pp. 27-28. According to the Coast Guard's pilot departure statistics: of the 31 pilot departures over 11 years, 9 went to unspecified jobs and an additional 8 gave no reported reason for leaving. 2016 Final Rule, 81 Fed. Reg. at 11,919. Of the remaining 14 pilots, only 5 took pilotage jobs outside the Great Lakes.[17] *Id.*

The Coast Guard's cross-motion says little about Plaintiffs' contention that the Coast Guard was obligated to engage more fully with comments about other sources of retention problems or remedies for those problems. The Final Rule simply relied upon the pilot associations' general, non-empirical complaints concerning recruitment and retention by arguing, "[t]he pilots have emphasized these issues repeatedly at pilotage summits and GLPAC meetings,

---

[17] The idea that pilots can just pick up and move to a different region of the country runs counter to the highly local nature of pilotage expertise. Pilotage involves a peculiarly local knowledge set and as a result, pilots do not have the mobility that Pilots and the Coast Guard assume. *See Interport Pilots Agency, Inc. v. Sammis*, 14 F.3d 133, 137 (2d Cir. 1994) ("The New York pilotage system is based on the assumption that only New York-licensed pilots have the expertise and familiarity with local waters and conditions to navigate safely."); *Jackson v. Marine Exploration Co.,* 583 F.2d 1336, 1338–39 (5th Cir. 1978) (citations omitted) ("Accordingly, it has long been the practice of vessels to employ, for each port they enter and leave, a local pilot intimately familiar with the waters of that port to board and guide them through those waters in from or back to the open sea."); *Darden v. Thompson*, 101 Va. 635, 44 S.E. 755 (1903), *aff'd*, 198 U.S. 310, 25 S. Ct. 660, 49 L. Ed. 1064 (1905) ("Pilotage is local, and not national").

and *we are not aware of evidence that the pilots' emphasis is misplaced*." 2016 Final Rule, 81 Fed. Reg. at 11,921 (emphasis added). As Plaintiffs noted in their opening memorandum, this "not aware of evidence" standard is a peculiar one; as is the Coast Guard's conclusion that Plaintiffs suggestions "may not work." The Coast Guard administers a government-permitted monopoly in Great Lake pilotage services and, through its rate-setting functions, takes money from ratepayers to fund that system. If recruitment and retention issues are used to justify target compensation for a Great Lakes pilot of $326,114 for a nine month, 180 work-day navigation season, the Coast Guard is obligated to inform itself and the interested public and, particularly, the ratepayers as to the causes, scope and remedies for the retention issues. The rulemaking comments squarely identified these issues and the ratepayers are fully entitled to have a rate-setting body that makes itself "aware" of factors that underlie its extraction of substantial costs against their operations.

Plaintiffs also noted that the Coast Guard's conclusion that pilotage delays are caused by pilot shortfalls was undermined by other record evidence that showed, very clearly, that other factors impact delays. ECF No. 180-1, p. 38. The Coast Guard's response is that it was allowed to rely upon the evidence that it did, without consideration of Plaintiffs' evidence. ECF No. 21, p. 14. The problem however, remains that the Coast Guard's conclusion that there is a pilotage retention problem on the Great Lakes is the cornerstone of the Final Rule and the Defendants' response to this APA challenge. The Coast Guard acknowledges this. *See id.* That critical conclusion is not properly supported by the administrative record and other record evidence is directly at odds with the proposition that delays are caused by pilotage retention issues.

As noted already, *see supra* argument section III, the Coast Guard essentially creates a system of ever-increasing revenue for the three pilot association monopolies, while disclaiming

control how those pilot associations distribute that revenue to individual pilots. The Coast Guard does nothing to ensure that its target pilot compensation figure of $326,114, 2016 Final Rule, 81 Fed. Reg. at 11,934, actually reaches individual pilots.[18] The Coast Guard cannot claim there are retention issues, without adequate support, claim those retention issues are caused by inadequate compensation, again without adequate support, and then use these claims to effect significant rate increases without regulating – at all – how the Pilot Associations distribute pilot revenue.[19]

### IV.   This Court Has Authority To Remedy The Coast Guard's APA Violations.

Plaintiffs are seeking vacatur of the 2016 Final Rule, including both the new ratemaking methodology created by the Final Rule and the rates for the 2016 shipping season set via application of that new methodology. Vacatur is appropriate here, given the serious deficiencies in the Final Rule, which has created a methodology that yields impermissibly high rates both for 2016 and future shipping seasons, and because there are few disruptive consequences of vacatur at this time, after the close of the 2016 shipping season. *See Heartland Regional Med. Center v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009); *Mendoza v. Perez*, 72 F. Supp. 3d 168, 175 (D.D.C. 2014) (holding vacatur appropriate when "the timing of the vacatur is scheduled in a manner to avoid any disruptive consequences.").

The Coast Guard notes that it has issued a Notice of Proposed Rulemaking for the 2017 navigation season and that the 2017 NPRM proposes changes to pilot demand assumptions that,

---

[18] It may be that the Pilots Associations and the Coast Guard will argue in response that in certain years the system underperforms and so it may be inferred no individual pilots reach target revenue compensation figures in those years. However, the Coast Guard and Pilot Associations have advocated for and defended a system that yields hourly pilotage rates—it follows that pilot pay is therefore a function of demand for pilot services. The Coast Guard and Pilot Associations cannot have it both ways—complaining in low-demand years that pay is low and in high-demand years that they worked too hard.

[19] One of the three pilotage districts, District One, submits financial information to the Coast Guard that identifies individual compensation.  The District One financial submissions for 2014, data available to the Coast Guard at the time it issued the Final Rule (*see* ECF No. 21 at 18), showed wide variation in compensation ranging from $81,000 to 393,000.

"if implemented may moot some of Plaintiffs' arguments." ECF No. 21, p. 29. The fact that one or some of the issues noted by Plaintiffs may be remedied at some future time is not grounds for denying Plaintiffs vacatur of a APA non-compliant rule that contains serious flaws that impose significant monetary burdens on Plaintiffs. Guidance from this Court on the Coast Guard's decision to use a peak staff demand model, as well on the many other flaws in the Final Rule, will greatly assist all parties in reaching a fair ratemaking system going forward and cannot help but to improve the quality of the Coast Guard's regulatory process.

Finally, the Coast Guard argues that this Court cannot instruct the Coast Guard to take account of the extent to which the 2016 Final Rule favored Pilots Associations when it enacts future rules. Plaintiffs are not seeking refunds from the Pilots Associations of excessive fees already paid. Plaintiffs are seeking instruction from this Court, in the form of a judicial opinion granting their motion for summary judgment and vacating the Final Rule, to guide the Coast Guard going forward. Plaintiffs are asking that the Court make clear that the Coast Guard must consider how its prior ratemakings did or did not reach target revenue goals when it sets future revenue targets.

Separate and subsidiary to this larger point, Plaintiffs are seeking an adjustment, applied prospectively, for overpayments made in 2016, in the form of recognition in the 2017 Final Rule of those overpayments and a corresponding decrease in amounts paid to Pilots for the 2017 shipping season. This is the same request that the Pilots Associations made during their 2014 rate challenge. *See St. Lawrence Pilots Ass'n v. U.S. Coast Guard*, Case No. 1:14-cv-00392-TSC, ECF No. 11-1, p. 31 (D.D.C. July 14, 2014) ("the pilots respectfully request that this Court make clear that when the new rate is established the pilots will be entitled to recover from shippers (*i.e.*, ratepayers) the difference between that new rate and the improper rate[.]"). Both the

34

Plaintiffs and Pilots Associations have relied on *Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 153

(D.C. Cir. 1993) for the proposition, though the Pilots Associations appear to have abandoned

that reliance in their cross-motion papers. (ECF No. 20-1, p. 37). The *Allied-Signal* court

specifically addressed the case that the Coast Guard relies upon, *Bowen v. Georgetown Univ.

Hosp.*, 488 U.S. 204 (1988). According to the *Allied-Signal* court:

> If indeed the remand leads to replacement of the per-licensee allocation, and
> licensees enjoy only refunds for the difference between liability under the old rule
> and liability under the new (rather than total refunds), it might be argued that such
> a result allows the new rule to have "retroactive effect", in violation of
> *Georgetown University Hospital.* See 488 U.S. at 208, 109 S.Ct. at 471. There is,
> plainly, some retroactive effect. The effect, however, is only to define that aspect
> of the old rule that must be *cut away* as legally excessive. We do not read
> *Georgetown* as barring so limited a retroactive impact.

*Id.*, 988 F.2d 146, 152–53 (D.C. Cir. 1993).

Ultimately, the Final Rule is unlawful. It may be that a future, prospective rule taking

account of previous unlawfully high pilotage fees may not run afoul of the general prohibition on

retroactive ratemaking. This is particularly so when the D.C. Circuit has allowed limited

retroactive effects to correct legally excessive rates or charges. *Id.* Further, the filed rate doctrine

is inappropriate here.  The doctrine arises in federal regulation of tariff-filing entities who are not

vested with common carrier or public utility obligations to provide non-discretionary service.

Here, the pilots do not file rates; rather the Coast Guard sets rates, and so the filed rate doctrine

does not appear readily applicable.

In any event, whether this Court may instruct the Coast Guard to account for excessive

costs extracted from Plaintiffs or other ratepayers via application of the Final Rule is not the

most essential point here. The most essential point is that Plaintiffs are asking this Court to hold

that the Final Rule violates the APA in the ways enumerated in the Complaint and supporting

6482701.7

submissions, and to vacate the Final Rule and remand this matter to the Coast Guard for further action consistent with the Court's opinion.

## V.      Conclusion

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant summary judgment in their favor, deny summary judgment to either Defendants or Defendant-Intervenors, hold the Final Rule unlawful and vacated pursuant to the APA, direct such relief as is necessary to make whole Plaintiffs and other ratepayers who have been burdened by the arbitrary Final Rule throughout the 2016 navigation season, and provide for any other relief that is justified under the circumstances.

Dated: December 23, 2016                    Respectfully submitted,

                                            THOMPSON COBURN LLP

                                            By  /s/ C. Jonathan Benner_____
                                                 C. Jonathan Benner (DC Bar #181610)
                                                 1909 K Street, N.W.
                                                 Suite 600
                                                 Washington, D.C. 20006-1167
                                                 202-585-6900
                                                 FAX 202-585-6969
                                                 jbenner@thompsoncoburn.com

                                                 *Attorney for Plaintiffs*

6482701.7

## CERTIFICATE OF SERVICE

I certify that on December 23, 2016, I caused a true and correct copy of the foregoing

Memorandum to be filed with the Court using the Court's Electronic Case Files System ("ECF").

The document is available for review and downloading via the ECF system, and will be served

by operation of the ECF system upon all counsel of record.


/s/ M. Loughran Potter
M. Loughran Potter

6482701.7