# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN GREAT LAKES PORTS     :
ASSOCIATION, *et al.*,     :
    :
      Plaintiffs,     :
    :    Civil Action No.:    16-1019 (RC)
      v.     :
    :    Re Document Nos.:    18, 20, 21
ADMIRAL PAUL F. ZUKUNFT,     :
*Commandant, United States Coast Guard,*     :
*et al.*,     :
    :
      Defendants.     :

## MEMORANDUM OPINION

**GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

In 2016, the Coast Guard promulgated new rules for calculating the rates that international shippers must pay American maritime pilots on the waters of the Great Lakes. Throughout the notice-and-comment process, Plaintiffs—representatives of the international shipping community—criticized the proposed rules in a variety of ways.  After having their comments largely rejected, the shippers sued the Coast Guard in this Court under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*.  All the parties have now moved for summary judgment on Plaintiffs' claims.  For the various reasons explained below, the Court grants in part and denies in part Plaintiffs' motion for summary judgment.

## II. BACKGROUND

With limited exceptions, all foreign vessels[1] operating in the Great Lakes and some of their connecting waters (collectively "the Great Lakes") must employ a registered Canadian or American maritime pilot to aid in navigation. 46 U.S.C. § 9302(a)(1). In 1960, Congress enacted the Great Lakes Pilotage Act ("GLPA"), which authorized the United States Coast Guard ("Coast Guard") to "form[] . . . a pool . . . of United States authorized pilots to provide for efficient dispatching of vessels and rendering of pilotage services" in the waters of the Great Lakes. *Id.* §§ 9301(2), 9304(a). Thus, pilots on the Great Lakes are organized into private associations certified by the Coast Guard, which operate in three separate geographical districts.[2] *See* Great Lakes Pilotage Rates—2016 Annual Review and Changes to Methodology, 81 Fed. Reg. 11,908, 11,910 (Mar. 7, 2016). The Coast Guard is responsible for setting "standards of competency" for registered American pilots and prescribes "rates and charges for pilotage services, giving consideration to the public interest and the cost of providing the services." 46 U.S.C. § 9303(a), (f). Thus, the Coast Guard determines the base pilotage rates that foreign vessels must pay to hire American maritime pilots to navigate the Great Lakes and reviews and adjusts these rates annually. *See id.*

In September 2015, the Coast Guard issued a Notice of Proposed Rulemaking ("NPRM") informing the public that the Coast Guard sought to "revis[e] the current methodology by which

---

[1] The statute applies both to "foreign vessel[s]" and "vessel[s] of the United States operating on register," which are U.S.-flag vessels participating in foreign trade. 46 U.S.C. § 9302(a); 46 C.F.R. § 67.17.

[2] "District One comprises areas 1 and 2, the U.S. waters of the St. Lawrence River and Lake Ontario. District Two comprises areas 4 and 5, the U.S. waters of Lake Erie, the Detroit River, Lake St. Clair, and the St. Clair River. District Three comprises areas 6, 7, and 8, the U.S. waters of the St. Mary's River, Sault Ste. Marie Locks, and Lakes Huron, Michigan, and Superior." 81 Fed. Reg. at 11,910.

the Coast Guard sets base rates for U.S. pilotage service" and to set pilotage rates for the 2016

shipping season using that new methodology. Great Lakes Pilotage Rates—2016 Annual

Review and Changes to Mehodology, 80 Fed. Reg. 54,484, 54,484 (Sept. 10, 2015). The reasons

for the methodology change were twofold. First, the Coast Guard explained that "over many

years both pilots and industry have identified certain methodology issues that they believe

significantly distort[ed] ratemaking calculations." *Id.* In particular, "[p]ilot associations

believe[d] those distortions result[ed] in low rates that contributed to their difficulty in retaining

pilots and attracting applicant pilots." *Id.* Second, a methodology change was required because

certain data that the Coast Guard previously relied upon would no longer be available. *See id.*

Before 2016, the Coast Guard's pilotage rate-setting methodology relied, in part, on union

compensation data for merchant marine masters and mates.[3] 81 Fed. Reg. at 11,908; *see also St.

Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 204–05

(D.D.C. 2015). According to the Coast Guard, "only one union's contract data [was] ever []

made available to the Coast Guard," but that union "now regards th[e] data as proprietary and

[would] no longer disclose it to the Coast Guard." 80 Fed. Reg. at 54,484. Consequently, "the

Coast Guard no longer ha[d] access to the detailed breakdown of compensation calculation that

[its] [former] methodology [once] relie[d] on." *Id.* Thus, as a result of the previous complaints

from pilots and industry concerning the old methodology combined with the future unavailability

of pilot compensation data, the Coast Guard decided to change its methodology.

---

[3] The Coast Guard's aim was to compensate Great Lake registered pilots in a comparable
way to first mates on U.S. Great Lakes vessels. *St. Lawrence Seaway Pilots Ass'n, Inc.*, 85 F.
Supp. 3d at 204.

## A. 2016 Rate-Setting Methodology

The final pilotage rate-setting methodology adopted by the Coast Guard was largely the same as the rule that it had proposed in September 2015. *See* 81 Fed. Reg. at 11,942. The Coast Guard developed this methodology based on a set of recommendations made by the Great Lakes Pilotage Advisory Committee ("GLPAC"). *See id.* at 11,911. The GLPAC is a committee created by statute whose purpose is to assist the Coast Guard in formulating pilotage rates and policies.[4] *See* 46 U.S.C. § 9307(a). When the Coast Guard engages in those functions, the Coast Guard is required to consider the GLPAC's recommendations, *id.* at § 9307(d)(2), and in this instance, the Coast Guard accorded the GLPAC's recommendations significant weight, *see* 81 Fed. Reg. at 11,911.

In concept, the revised methodology is rather straightforward. The Coast Guard seeks to set hourly pilotage rates that will be sufficient to cover pilotage associations' expenses and also provide a modest rate of return. To do this, the Coast Guard first estimates the expenses that it expects the pilotage associations will incur, including expenses associated with pilot compensation, in the upcoming season. It then adds a return on investment based on high-grade corporate securities. Viewed together, the expenses and the return on investment, represent the target revenue amount that the Coast Guard is hoping the pilotage associations will achieve. To come up with an hourly pilotage rate sufficient to meet this goal, the Coast Guard divides the target revenue by an estimate of the number of hours it expects the associations will work. The

---

[4] The GLPAC is composed of seven members, including a representative from each of the three private associations, a representative for the interests of vessel operators, a representative for the interests of the ports, a representative for the interests of shippers whose cargoes are transported through the Great Lakes ports, and a member with a background in finance or accounting and must be unanimously selected by the other members of the committee. 46 U.S.C. § 9307(b)(2).

Coast Guard can then adjust this rate on an *ad hoc* basis under "supportable circumstances."  The

Coast Guard has broken out this methodology into the following eight steps:

> *Step One: "Recognize previous operating expenses."*  First, the Coast Guard examines the pilotage associations' prior expenses based on independent third-party audits and then determines which expense items should be recognized for the purpose of ratemaking.

> *Step Two: "Project operating expenses, adjusting for inflation or deflation."*  Next, the Coast Guard projects the pilotage associations' operating expenses (other than those expenses associated with compensating pilots) using the recognized operating expenses identified from Step One and adjusting them for inflation or deflation using U.S. government consumer price index data for the Midwest.

> *Step Three: "Determine number of pilots needed."*  The Coast Guard then projects how many pilots the Great Lakes will need in the upcoming shipping season.  Unlike the prior methodology, this step takes into account not only the "hours a pilot is on the vessel's bridge, but also the total average time a pilot spends in preparing for and returning from each pilot assignment."  It also uses a "peak-staffing model," which aims to determine the number of pilots needed at all times by looking to the amount of pilots needed during average peak-season demand in previous years.

> *Step Four: "Determine target pilot compensation."*  The Coast Guard then uses "the most relevant currently available non-proprietary information" to determine base individual pilot compensation.  The Coast Guard then multiplies that figure by the number of pilots needed calculated in Step Three.

> *Step Five: "Project return on investment."*  Because associations have management responsibilities and exposure to business risk, the Coast Guard calculates a return on investment.  To do this, the Coast Guard multiplies the sum of the operating expenses from Step Two and the target pilot compensation from Step Four by the annual rate of return for high-grade corporate securities.

> *Step Six: "Project needed revenue."*  Here, the Coast guard estimates the revenue that each pilotage association will need to successfully operate by adding together the projected operating expenses (Step Two), projected pilot compensation (Step Four), and projected return on investment (Step Five).

> *Step Seven: "Initially calculate base rates."*  At this step, the Coast Guard divides the projected needed revenue from Step Six by the averages of past hours worked in each geographic area's waters.

> *Step Eight: "Review and analyze rates."*  Finally, the Coast Guard reviews the base pilotage rates to make sure the rates meet the "goal of . . . promot[ing] safe,

efficient, and reliable pilotage service on the Great Lakes." At this step, the Coast Guard may either finalize the rates or "make[] necessary and reasonable adjustments to them based on requirements of Great Lakes pilotage agreements between the United States and Canada, or other supportable circumstances."

*See* 81 Fed. Reg. at 11,908–42.

## B. The Present Action

On May 31, 2016, the American Great Lakes Ports Association, a not-for-profit organization representing the interests of commercial ports and port users in the United States, and several other organizations in the shipping industry sued the Coast Guard under the Administrative Procedure Act ("APA"), claiming that the new methodology and 2016 pilotage rates were arbitrary and capricious in various respects. *See* Compl. at 4–5, 20, ECF No. 1. Thereafter, the three Great Lakes pilotage associations ("Pilots") moved to intervene as defendants. Pilots Ass'ns Mot. Intervene Supp. Defs., ECF No. 6. The Court granted the pilotage associations' motion to intervene because of their strong interest in the outcome of the litigation. *See Am. Great Lakes Ports Ass'n v. Zukunft*, 16-cv-1019, 2016 WL 8608457 (D.D.C. Aug. 26, 2016). Plaintiffs, Defendants, and Intervenors have each moved for summary judgment, and the motions are now ripe for decision. *See* Pls.' Mot. Summ. J. ("Pls.' Mot."), ECF No 18; Def.–Intervenors' Cross-Mot. Summ. J. ("Pilots' Mot. Summ. J."), ECF No. 20; Defs.' Cross-Mot. Summ. J. ("Coast Guard's Mot. Summ. J."), ECF No. 21.

## C. 2017 Modification to Rate-Setting Methodology

On April 5, 2017, the Coast Guard issued a notice of proposed rulemaking setting rates for the 2017 shipping season. In that notice, the Coast Guard also proposed modifying the rate-setting methodology to account for so-called "weighting factors"[5] that it did not account for in

---

[5] As described in greater detail *infra*, "weighting factors" are multipliers that are used by pilotage associations to calculate the actual pilotage fees that the associations will charge for any

2016. *Great Lakes Pilotage Rates—2017 Annual Review*, 82 Fed. Reg. 16,542 (Apr. 5, 2017).

However, the Coast Guard made clear that "until a final rule is produced, the 2016 rates will stay

in effect, even if a final rule is not published by the start of the 2017 season." *Id.* at 16,542  On

August 31, 2017, the Coast Guard issued a final rule incorporating the weighting factors into its

rate-making methodology. *See Great Lakes Pilotage Rates—2017 Annual Review*, 82 Fed. Reg.

41,466, 41,466 (Aug. 31, 2017).  While this rule revised "the pilotage rates for the remaining

portion of the 2017 shipping season," it made no purported adjustments to the rates applied in the

2016 shipping season. *See id.*

### III.  LEGAL STANDARDS

In a typical case, the Court must grant summary judgment to a movant who "shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Winston & Strawn, LLP v. McLean*, 843 F.3d 503,

505 (D.C. Cir. 2016).  But in the context of the APA, the Court's review of the administrative

record is limited. *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)

(citing *National Wilderness Inst. v. United States Army Corps of Eng'rs*, 2005 WL 691775, *7

(D.D.C. 2005)).  It is the agency's role to resolve issues of fact and regulate in accordance with

those facts. *See id.*  The district court's review is confined to determining whether, as a matter of

law, the evidence in the administrative record supports the agency's decision. *Citizens for

Responsibility & Ethics in Washington v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013).

"Summary judgment thus serves as the mechanism for deciding, as a matter of law, whether the

agency action is supported by the administrative record and otherwise consistent with the APA

---

given voyage.  In essence, the larger the vessel, the higher the weighting factor, and the more the
pilotage associations can charge.

standard of review." *Id.* at 90 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n. 28 (D.C. Cir. 1977)).

Under 5 U.S.C. § 706(2)(A), a reviewing court must set aside agency actions that are arbitrary or capricious. The touchstone of arbitrary-and-capricious review is reasoned decisionmaking. Harry T. Edwards, Linda A. Elliott & Marin K. Levy, *The Requirement of Reasoned Decisionmaking: Arbitrary and Capricious Review Under the APA*, Federal Standards of Review Ch. XV (Apr. 2013) ("Federal Standards of Review Ch. XV") (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Thus, a court cannot set aside an agency rule that is "rational, based on consideration of the relevant factors[,] and within the scope of the authority delegated to the agency by the statute." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 42–43. Although this is a deferential standard, it still requires a reviewing court to take a "hard look" at an agency's reasoning. *See* Federal Standards of Review Ch. XV (quoting *Nat'l Lime Ass'n v. EPA*, 627 F.2d 416, 451 n.126 (D.C. Cir. 1980)). In the context of notice-and-comment rulemaking, "[t]he function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970). This requires the agency to "articulate with reasonable clarity its reasons for decision, and identify the significance of the crucial facts." *Id.*

An agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Thus, an "agency must examine the relevant data and articulate a satisfactory explanation

for its action including a rational connection between the facts found and the choice made." *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 814 (D.C. Cir. 1983) (quotation marks and citation omitted). With that said, "[a]n agency has discretion to design rules that can be broadly applied, sacrificing some measure of 'fit' for administrability." *Leather Indus. of Am., Inc. v. EPA*, 40 F.3d 392, 403 (D.C. Cir. 1994) (citing *Petroleum Commc'ns v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994)); *see also Am. Pub. Gas Ass'n v. Fed. Power Comm'n*, 567 F.2d 1016, 1046 (D.C. Cir. 1977) (internal quotations and citations omitted) ("Courts cannot fairly demand the perfect at the expense of the achievable."). Shortcomings and analytical weak points, if justified or explained in light of practical constraints, do not render a regulation arbitrary or capricious. *See City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1168 (D.C. Cir. 1987). Indeed, even the "best available data standard leaves room for error, so long as more reliable data did not exist at the time of the agency decision." *Baystate Med. Ctr. v. Leavitt*, 545 F. Supp. 2d 20, 49 (D.D.C. 2008), *amended in part*, 587 F. Supp. 2d 37 (D.D.C. 2008), *judgment entered*, 587 F. Supp. 2d 44 (D.D.C. 2008).

## IV.  ANALYSIS

In this case, Plaintiffs present a litany of arguments for why the Coast Guard's 2016 rate-setting methodology and 2016 pilotage rates were arbitrary and capricious.[6]  Broadly speaking, these challenges fall into three categories. First, Plaintiffs challenge one of the Coast Guard's overall rationales underpinning the changes to the rate-setting methodology. Specifically, they challenge the Coast Guard's conclusion that pilotage rates should be increased to address the

---

[6] The Court concludes that oral argument would "be of no meaningful assistance [to it] in rendering a final decision," and thus exercises its discretion to deny Plaintiffs' request for oral argument. *Owen-Williams v. BB & T Inv. Servs., Inc.*, 797 F. Supp. 2d 118, 126 (D.D.C. 2011); *see also* LCvR 7(f).

pilotage associations' problems in recruiting and retaining pilots. Second, Plaintiffs challenge

features that the Coast Guard chose to include in its rate-setting methodology. Namely, the

methods by which the Coast Guard estimates expenses associated with pilotage compensation.

Finally, Plaintiffs challenge certain features that the Coast Guard decided not to include in its

rate-setting methodology. In particular, Plaintiffs argue that the Coast Guard's failure to

consider the impact of so-called "weighting factors" on revenue was arbitrary and capricious. In

addition, Plaintiffs contend that the Coast Guard also violated the APA when it decided not to

include a "truing up" mechanism to account for the differences between projections and actual

collections in past years. The Court addresses each of these arguments in turn.

### A. Challenge to the Coast Guard's Overall Rationale - Pilot Recruitment and Retention

According to the Coast Guard's NPRM, one of the reasons the Coast Guard sought to

change the rate-making methodology was to address the problem of attracting and retaining

qualified pilots to service the Great Lakes. The NPRM states:

> According to the pilot associations, the variance between projected revenue and actual
> revenue represents a significant challenge, because failure to achieve published revenue
> projections deprives them of the resources they need to provide safe, efficient, and
> reliable pilotage service. The associations cite challenges in making capital investments,
> recruiting and retaining adequately qualified pilots, achieving professional development
> and training schedules recommended by the American Pilots Association, updating
> technology, and achieving target compensation goals. The associations say that as a
> result, several experienced pilots have left the system, and that other desirable mariners
> have been discouraged from applying to become pilots.

80 Fed. Reg. at 54,486. The Coast Guard, therefore, sought "specific regulatory changes

intended to address these issues." *Id*.

During the notice-and-comment period, Plaintiffs complained that the Coast Guard had

cited "no evidence of having verified [the pilotage associations'] claims or having examined the

many issues—beyond compensation—that [affect] pilot recruitment and retention."

Administrative Record ("A.R.") at 317, ECF Nos. 27-1 though 27-3.[7]  Thus, they proposed that

the Coast Guard study other potential causes and evaluate additional remedies.  Specifically, they

recommended that the Coast Guard study "statistical and historical pilot retention issues by,

among other means, conducting interviews with pilots who have left the Great Lakes system."

A.R. at 317.  Plaintiffs posited that difficulties with attraction and retention could be caused by

factors like the high barriers to entry in the pilotage profession or the revenue sharing practices

used by the pilotage associations, but they did not provide a factual basis for these alternative

hypotheses.  A.R. at 317.  The commenters also requested that the Coast Guard consider whether

the retention challenges could be resolved through incentives other than increased wages, such as

changes that would improve pilots' "quality of life, living standards, and job satisfaction,"

though the commenters did not provide any specific suggestions in this regard.  *See* A.R. at 317.

In its Final Rule, the Coast Guard acknowledged and responded to Plaintiffs' comments.

The Coast Guard observed that thirty-one pilots had left the Great Lakes pilotage associations in

the preceding eleven years and that the total number of pilots servicing the Great Lakes had

decreased by twenty-two percent between 2007 and 2014.  81 Fed. Reg. at 11,919.  While the

Coast Guard did attempt to identify the jobs that former pilots went on to perform, it did not

identify the specific reasons that the pilots left the pilotage associations.  *See id.* at 11,919–21.

Implicitly, however, the Coast Guard suggested that the recruitment and retention problems were

at least partially caused by the relatively low compensation offered to pilots in the Great Lakes.

Indeed, the Coast Guard skeptically viewed the commenters' proposed solutions "given the

career-long prospects a recruit or new pilot faces for lower compensation than their counterparts

---

[7] Because of its size, the parties filed the administrative record in three parts.  Pages 1–271 are filed on ECF at 27-1; pages 272–540 are filed at 27-2; and pages 541–1369 are filed at ECF No 27-3.

[on the] Canad[ian] side [of the Great Lakes] or in other U.S. ports." *Id.* at 11,921. According to

the Coast Guard, "[t]he pilots have emphasized these issues repeatedly at pilotage summits and

GLPAC meetings, and [the Coast Guard] [was] not aware of evidence that the pilots' emphasis

[was] misplaced." *Id.* While the Coast Guard reiterated its openness to "any reasonable

proposals for mitigating th[e] [recruitment and retention] difficulties," it believed that the

remedies "suggested by [Plaintiffs] may not work and could take longer than the system [could]

sustain in the face of more pilot departures and the inability to replace those pilots." *Id.*

Therefore, the Coast Guard concluded that "increased pilot rates [were] the best and quickest

way to attract and retain more qualified pilots." *Id.*

Plaintiffs now argue that the Coast Guard's promulgation of the modified rate-making

methodology was not an exercise in reasoned decisionmaking because it was based in part on the

Coast Guard's belief that low pilotage compensation was responsible for the recruitment and

retention problems, which Plaintiffs contend was not supported by empirical evidence. Pls.'

Mot. at 31. As discussed above, "[a]n agency decision arrived at through informal rulemaking

must have a rational basis in the record and be based on a consideration of the relevant factors

under its statutory mandate." *Nat'l Ass'n of Regulatory Util. Comm'rs v. FCC*, 737 F.2d 1095,

1124 (D.C. Cir. 1984) (citing *Almay, Inc. v. Califano*, 569 F.2d 674, 681 (D.C. Cir. 1977)).

Thus, "when an agency undertakes a thorough, primary, evaluation of all relevant facts, it is

highly desirable that the agency: independently amass the raw data; verify the accuracy of that

data; apply that data to consider several alternative courses of action; and reach a result

confirmed by the comments and submissions of interested parties." *Id.* However, contrary to

Plaintiffs' suggestions, "[t]he APA imposes no general obligation on agencies to produce

empirical evidence. Rather, an agency has to justify its rule with a reasoned explanation."

*Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009); *see also Chamber of Commerce of United States of Am. v. NLRB*, 118 F. Supp. 3d 171, 183 (D.D.C. 2015) ("The agency . . . need not—indeed cannot—base its every action upon empirical data; depending upon the nature of the problem . . . ." (internal citations and quotation marks omitted)). Thus, an agency may, for example, "rely on comments submitted during the notice and comment period as justification for [a] rule, so long as the submissions are examined critically." *Chamber of Commerce of United States of Am. v. Nat'l Labor Relations Bd.*, 118 F. Supp. 3d 171, 183 (D.D.C. 2015) (internal citation omitted); *see also Nat'l Ass'n of Regulatory Util. Comm'rs*, 737 F.2d at 1124 ("A degree of agency reliance on these comments is not only permissible but often unavoidable.").

Based on the record and the deferential arbitrary and capricious standard, the Court finds no basis to overrule the Coast Guard's considered judgment as to pilot recruitment and retention. As the Coast Guard noted, the number of pilots servicing the Great Lakes had been steadily dropping for years. In total, the Great Lakes system had lost twenty-two percent of its pilots between 2007 and 2014.[8] 81 Fed. Reg. at 11,919. Based on the Coast Guard's long-experience regulating Great Lake pilotage and the numerous comments supporting its position, the Coast Guard could rationally conclude that there existed "chronic pilot attraction and retention difficulties" and that these difficulties were caused, at least in part, by the under-compensation of pilots. Indeed, the administrative record is brimming with comments submitted during the notice

---

[8] Plaintiffs take issue with the fact that the Coast Guard did not provide the number of pilots who have left Great Lakes pilotage associations until publication of the final rule. Pls.' Mot. at 31. Plaintiffs acknowledge that disclosing such data at the time the final rule is announced is only problematic if they would have had "something useful to say" about it. *See* Pls.' Mot. at 31 (quoting *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 229, 237 (D.C. Cir. 2008)). However, they never explain what useful thing they would have had to say about it; instead they criticize it as incomplete. *See* Pls.' Mot. at 31.

and comment period and statements at GLPAC meetings that explain, albeit anecdotally, that seasoned pilots were leaving and that the associations could not attract new qualified pilots because pilot compensation in the Great Lakes was low relative to other areas in the United States and Canada. *See e.g.*, A.R. at 126; ("These revenue shortfalls have led to severe problems in attracting and retaining the very best mariners to serve as Great Lakes pilots"); A.R. at 343 ("My last few years have been a constant battle to attract skilled pilots to replace an aging group"); A.R. at 349 ("During my 13 years with Western Great Lakes Pilots I watched young, qualified pilots leave one after another. The lack of time off and never seeing a single pilot in 13 years reach 'Target Compensation' was too much for many former pilots to endure."); A.R. at 599 (the Great Lakes pilots are "the lowest paid pilots in America" and "have the highest workload in America," so "it's not particularly surprising that they would have a retention and attraction problem."); A.R. at 600–01 (established pilots have left to work in the Gulf, which used to be considered "the bottom of the pickle barrel" because "nobody went to the Gulf," and have reported back that they will never return to the Great Lakes because they are "making real money" in the Gulf). Furthermore, Plaintiffs have never presented any evidence nor have they even suggested—either in their comment or in their briefing—that compensation was *not* a leading cause for pilot recruitment and retention problems. Thus, the Coast Guard's decision to increase pilotage rates such that, among other things, pilot compensation might be improved is a rational decision based on the record, even absent the empirical evidence demanded by Plaintiffs. *See Stilwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009) (finding "no basis, at least under the deferential arbitrary and capricious test, for overruling [agency]'s considered judgment of the need for [specific] regulation," despite the lack of "empirical evidence justifying the new regulation," when the agency "based its proposed rule on its long

experience of supervising mutual savings associations" and "its view found support in various comments submitted in response to the proposed rule").

In addition to the Coast Guard's failure to identify empirical evidence supporting its decision, Plaintiffs fault the Coast Guard for its failure to evaluate whether recruitment and retention challenges could have been remedied in other ways. The Court finds this argument unpersuasive. First, as noted above, Plaintiffs never actually quibbled with the Coast Guard's conclusion that pilot retention and recruitment was significantly impaired by compensation that was not competitive for the industry. Rather, Plaintiffs merely recommended that the Coast Guard explore other potential causes and solutions, but provided no cogent rationale for doing so. For example, the Plaintiffs suggested examining and potentially addressing the barriers to entering the pilotage profession, A.R. at 317, but this of course would not address the *retention* issues experienced by the pilotage associations. Moreover, the only other solutions that the Plaintiffs recommended for consideration were simply amorphous improvements to "quality of life, living standards, and job satisfaction," without explanation of what that would entail. A.R. at 317. Given this state of affairs, the Coast Guard was not required to delay promulgating a rule designed to resolve a verified issue with an undisputed cause when the commenters failed to offer any other cogent solutions. *See Star Wireless, LLC v. FCC*, 522 F.3d 469, 475 (D.C. Cir. 2008) ("an agency need not address all problems at once. Instead, its rules may solve first those problems it prioritizes." (citing *U.S. Cellular Corp. v. FCC*, 254 F.3d 78, 86 (D.C. Cir. 2001))). Thus, in light of the Plaintiffs' comment and the record before the agency, the Court cannot conclude that the Coast Guard "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [promulgated a rule] so

implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43.

## B. Challenges Based on Features Included in the Coast Guard's Rate-Setting Methodology

Plaintiffs raise challenges to two features that the Coast Guard included in its rate-setting methodology—both of which concern how the Coast Guard projects expenses associated with pilot compensation. First, Plaintiffs contest the method through which the Coast Guard estimates the number of pilots needed for a given season. Second, they question how the Coast Guard goes about setting the target compensation for those pilots.

### 1. Use of the Peak-Staffing Model

Under Step Three of the Coast Guard's revised rate-setting methodology, the Coast Guard must determine how many pilots will be needed in a given shipping season. To do this, it relies on a so-called "peak-staffing model." Plaintiffs contend that the Coast Guard's promulgation of the revised rate-setting methodology, which included this model, is arbitrary and capricious because the Coast Guard failed to explain why the shipping industry "should incur the substantial cost of a peak demand model" and because the Coast Guard failed to address comments that "questioned its necessity and suggested viable alternatives." Pls.' Mot. at 22.

In the NPRM, the Coast Guard announced its intention to calculate the number of pilots needed for a given shipping season based on the "number of pilots needed to meet each shipping season's peak pilotage demand periods without interruption to service." 80 Fed. Reg. at 54,489. In their comment, Plaintiffs argued that the Coast Guard "must consider necessity and public interest in imposing the substantial cost increases proposed under the peak staffing model in the proposed rule." A.R. at 296. Plaintiffs pointed out that, as the Coast Guard was well aware, "peak traffic demand is concentrated at the beginning of a shipping season, to handle the traffic

buildup created by the previous season's closure, and at the end of the season, when vessels seek to complete their voyages before closure." A.R. at 296 (quoting 80 Fed. Reg. at 54,490). Despite the fact that peak pilotage demand only spiked at the beginning and end of the seasons, the peak staffing model proposed by the Coast Guard would maintain pilots throughout the entirety of the season. *See* A.R. at 296. Plaintiffs argued that the prior methodology had proven to be adequate, despite not relying on a peak staffing model. Plaintiffs pointed to a 2013 study that showed, in 2011, one of the districts experienced a pilot shortage of only one day out of a 270-day season and that other districts had similar statistics. *See* A.R. at 296–97. Despite the lack of delays under the former model (at least in 2011), the peak-staffing model would require an additional fourteen pilots to meet peak-demand periods and therefore the pilotage associations would need to recover a substantial amount of additional revenues to compensate those pilots. *See* A.R. at 297. This additional cost would be borne by the shipping industry in the form of increased pilotage rates. *See* A.R. at 297. According to Plaintiffs, this increased cost was indefensible when the evidence did not demonstrate a need for more pilots. *See* A.R. at 297.

In response to Plaintiffs' comment, the Coast Guard explained that while "[t]raffic peaks usually are confined to the periods just after the opening and just before the closing of a season," they "could occur at other times as well." 81 Fed. Reg. at 11,922. It argued that "[s]etting pilot numbers high enough to accommodate all these peak periods is essential for reducing traffic delays during peak periods." *Id.* In addition, the Coast Guard believed that this staffing level was "essential if [it] [was] to provide the recuperative monthly rest periods recommended by the NTSB in the interests of safety." *Id.* This recuperative rest was necessary, according to the Coast Guard, to ensure that "pilots have sufficient off-assignment time during the season so they can avoid chronic fatigue." *Id.* at 11,918. Thus, broadly speaking, the two arguments advanced

by the Coast Guard in support of the peak staffing model were (1) to decrease shipping delays, and (2) to ensure safe piloting on the Great Lakes by offering pilots sufficient recuperative rest.

With regard to its "delay" rationale, the evidence cited by the Coast Guard is perhaps best characterized as inconclusive. In the Final Rule, the Coast Guard compared the overall strength of pilot staffing against the total number of delay hours experienced on the Great Lakes between 2007 and 2014. One significant limitation of this data is that the delay data does not differentiate between delays caused by pilotage shortages and delays caused by other factors. Thus, one cannot specifically discern whether the delays were being caused by one factor or another. Generally speaking, however, the data, when viewed together, does show a long-term trend of more delays as pilotage numbers decreased. *See* 81 Fed. Reg. at 11,921, fig. 6. Indeed, there were significantly more delays in 2015 than there were in 2007 and, at the same time, there were also significantly fewer pilots. *See id*. Closer examination of the data, however, does not necessarily show a strong correlation between the number of pilots and traffic delays. While the number of pilots decreased steadily over time, the amount of delays fluctuated both up and down—sometimes in ways that did not suggest pilotage shortages were the cause. *See id*. For example, in some years, delays remained constant while the number of pilots decreased. *See id*. In other years, it seems that delays increased even though the number of pilots remained the same. *See id*. And in still other years, it appears that both delays and pilot numbers decreased simultaneously. *See id*. Each of those scenarios seems inconsistent with the view that decreased pilot staffing was responsible for increased delays. The Coast Guard admitted in its final rule that "[o]ther factors contribute to delays," but it still argued that "clearly pilot shortfalls are one important factor." *Id*. at 11,921. While this could be true, the Coast Guard's data does not make this point as "clearly" as the Coast Guard would suggest—at least not without some expert

explanation that the Coast Guard does not provide. Nonetheless, the Court cannot say that the evidence necessarily runs counter to the Coast Guard's conclusion, thus it cannot find the Coast Guard to have acted arbitrarily or capriciously on this basis.

The Coast Guard's second rationale—safety—stands on more solid footing. Under the GLPA, the Coast Guard is required to give "consideration to the public interest and the costs of providing the services" when it sets pilotage rates. 46 U.S.C. § 9303(f). There is of course a strong public interest in maintaining safe pilotage. *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319, 334 (D.C. Cir. 2011) ("The legislative history of the GLPA indicates the factors at issue in regulating Great Lakes pilotage—including the need for maritime safety . . . ."); *see also Transp. Inst. v. U.S. Coast Guard*, 1989 WL 222493, at *4 (D.D.C. Aug. 3, 1989). It is particularly in this regard to maritime safety, however, that "a great deal of deference is owed to the 'Coast Guard's expertise.'" *Pub. Emps. for Envtl. Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 100 (D.D.C. 2014) (alteration omitted) (quoting *Collins v. Nat'l Transp. Safety Bd.*, 351 F.3d 1246, 1253 (D.C. Cir. 2003)).

In this case, the record before the Coast Guard amply supported the Coast Guard's conclusion that greater staffing levels were needed to improve safe pilotage on the Great Lakes. In 2013, the Coast Guard received a report that aptly noted that "[a]ppropriate staffing levels need to reflect sufficient pilots to meet demand (to avoid delays) within reasonable workloads (to avoid fatigue-related risks)." A.R. at 1187. Even at that time, the study found that one of the key risks facing the Great Lakes system were inadequate rest periods for pilots, which were "increasing fatigue and risking the safe navigation of [] ship[s]." A.R. at 1192. In addition, during the notice-and-comment period, numerous comments agreed that increased staffing was needed in order to combat pilot fatigue and improve safety. *See, e.g.*, A.R. at 92 ("While the

rationale in the NPRM has focused on determining the number of pilots needed based on the need to avoid costly delays to shipping, there is an equally if not more important need to reduce potential for fatigue related accidents."); A.R. at 114–15 (citing to studies showing that "more than 80 percent of maritime property damage claims and more than 90 percent of collisions are, conclusively, due to the Master of Pilot's irregular work schedule," particularly in light of the "inherent lack of regular work/sleep cycles," and stating that "a potentially inattentive or even indifferent pilot, guiding a somewhat sub-standard vessel has 'Environmental Disaster' written all over it"); A.R. at 588 ("Their arguments miss the point when they ignore that staffing to peak demand is a safety issue to mitigate the dangers of overworked pilots impaired by fatigue jeopardizing the safety of shipping and the environment."). In light of the high degree of deference owed to the Coast Guard in matters of safety and the record supporting its conclusion that greater staffing was needed to address pilot fatigue, the Court cannot say that the Coast Guard failed to engage in reasoned decisionmaking.[9]

Finally, Plaintiffs argue that the Coast Guard failed to consider the viable alternatives that they presented in their comments. During the notice-and-comment period, Plaintiffs suggested that, as a less-costly means of providing pilotage service during peak periods, the Coast Guard could employ "contract pilots" and "cross-qualifying pilots such that pilots from one area are

---

[9] Plaintiffs also seem to argue that whatever the overarching rationale for the peak staffing model might have been, the Coast Guard still failed to specifically justify its cost. *See* Pl.'s Reply at 24, ECF No. 23. What Plaintiffs fail to acknowledge is that the Coast Guard's safety rationale *does* justify the cost of the model. The Coast Guard has been clear that it understands additional safety measures will come at a cost. *See* A.R. 602–03 ("The Coast Guard's position is this. We want safe. We're going to demand safe, efficient and reliable service. And there's the flipside to that. That costs money. And whatever that cost is, you know, we plan to be transparent as possible to let everyone know these are the costs that go into that."). Thus, when the Coast Guard decides, in its expert judgment, that safety measures are necessary, that rationale is also necessarily a justification of the associated cost.

able to help relieve traffic delays in another area." Pls.' Mot. at 26; A.R. at 298. The Coast Guard responded in two ways that each prove fatal for Plaintiffs' proposed alternatives. First, it noted that sufficiently high pilot numbers were "essential" to providing the necessary recuperative rest periods for pilots throughout the shipping season, which it deemed necessary for the interests of safety. 81 Fed. Reg. at 11,922. Simply, hiring contract pilots during peak demand times alone would do nothing to ensure that pilots are given sufficient rest throughout the shipping season. Second, the Coast Guard noted that contract pilots[10] "are unlikely to possess current and thorough knowledge of local waters," which the Coast Guard "consider[s] . . . essential for safe piloting, especially in the bad weather conditions often experienced during peak periods." *Id.* According to the Coast Guard, such knowledge takes up to four years to acquire "and cannot be summoned at short notice to address temporary traffic peaks." *Id.* Plaintiffs do not dispute the Coast Guard's logic on these points; rather, they categorically assert that the Coast Gaurd did not address their suggestions. *See* Pls.' Reply at 26. Because the Coast Guard did indeed respond in a way that allows the Court to see why it did not opt for Plaintiffs' alternative proposals, Defendants are entitled to summary judgment on this issue.

### 2. Pilot Compensation

The Court next considers the method that the Coast Guard chose to estimate target pilot compensation. In previous ratemakings, the Coast Guard estimated pilot compensation based on data that it received from a union for merchant marine masters and mates. 81 Fed. Reg. at 11,908; *see also St. Lawrence Seaway Pilots Ass'n, Inc. v. United States Coast Guard*, 85 F. Supp. 3d 197, 204–05 (D.D.C. 2015). However, the union later took the position that the data

---

[10] Although the Coast Guard did not mention "cross-qualifying pilots" by name, the same logic applies to them as it does to contract and semi-retired pilots; all three groups would be called upon to pilot through unfamiliar waters.

was proprietary and would no longer provide it to the Coast Guard for ratemakings. 80 Fed. Reg. at 54,484. Accordingly, the Coast Guard was forced to develop a new means of estimating pilot compensation.

The Coast Guard considered three possible data sources to benchmark pilot compensation in the NPRM: (1) Canadian Laurentian Pilotage Authority ("LPA") pilot compensation data, (2) Bureau of Labor Statistics ("BLS") wage data for masters, mates and pilots, and (3) Canadian Great Lakes Pilotage Association ("Canadian GLPA") registered pilot compensation data. *Id.* at 54,497. After reviewing these sources, the Coast Guard suggested reliance on the Canadian GLPA data because the work performed by those pilots was highly analogous to the work performed by U.S. pilots on the Great Lakes. The Coast Guard found the LPA data to be unsuitable as a benchmark because the LPA serviced ships year-round, rather than seasonally, and because the ships that the LPA serviced were typically larger than those in the Great Lakes. *Id.* The Coast Guard also found the BLS data to be inapt because it covered officers whose duties and responsibilities differed greatly from those of U.S. pilots on the Great Lakes. For example, unlike the U.S. Great Lakes pilots, most of the officers represented in the BLS data, were "not directly responsible for the safe navigation of vessels of any tonnage through restricted waters." *Id.* Moreover, the Coast Guard found that the BLS data was "skewed downward by the higher number of lower wage mates, who do not hold the same licenses as masters and pilots." *Id.* By contrast, Canadian GLPA pilots "work[ed] under the same conditions, months, and vessels (sometimes concurrently) as the U.S. pilots." *Id.*

However, while the "Canadian GLPA pilots provide[d] service that [was] almost identical to the service provided by U.S. Great Lakes pilots," the Coast Guard felt that some amount of adjustment was needed to reflect the fact that, unlike U.S. pilots, Canadian pilots were

government employees. *Id.* As a result, Canadian GLPA pilots were "guaranteed minimum compensation with increases for high-traffic periods," had "retirement, healthcare, and vacation benefits" as well as limited professional liability. *Id.* Based on these differences, the Coast Guard believed that there were "supportable circumstances for adjusting U.S. target pilot compensation." *Id.* at 54,498. The Coast Guard recommended a ten-percent increase to the benchmark based on comments made at a GLPAC meeting in 2014, which the Coast Guard believed would appropriately "balance[e] the different status[es] of the U.S. and [Canadian] GLPA pilots." *Id*; *see also* A.R. at 1047.

After the notice and comment period, the Coast Guard adopted the compensation estimation method that it set forth in its NPRM. In this suit, Plaintiffs argue that the Coast Guard acted arbitrarily and capriciously by (1) using the Canadian GLPA data as a benchmark and (2) increasing that benchmark by ten percent to account for the additional benefits enjoyed by the Canadian GLPA pilots. Pl.'s Reply at 26. The Court finds that only the latter argument has merit.

Plaintiffs argue that the Coast Guard acted arbitrarily and capriciously by failing to adequately address their comment concerning the use of the Canadian GLPA pilot compensation data. Pl.'s Reply at 27–28. In their comment, Plaintiffs argued that the Canadian GLPA pilot compensation was not appropriate because, according to Plaintiffs, Canadian pilots perform a larger proportion of their services in designated waters whereas U.S. pilots "often operate vessels over long stretches of undesignated waters." A.R. at 308. This difference was significant in Plaintiffs' view because, "[u]nlike pilots in designated waters, pilots in undesignated waters are only required to be 'available' to the Master," which they claimed was "less demanding." A.R. at 308. But, contrary to Plaintiffs' claims, the Coast Guard squarely addressed and disputed

Plaintiffs' unsupported assertions. The Coast Guard emphasized once again that "[Canadian] GLPA pilots provide service that is almost identical to the service provided by U.S. Great Lakes Pilots." 81 Fed. Reg. at 11,914. It pointed out that "[w]ith the exception of Area 3, the [Canadian] GLPA provides pilotage service in *the same waters* as U.S. pilots do; in fact, whether a GLPA or U.S. pilot is assigned to a vessel is a matter of chance." *Id.* (emphasis added). Consequently, it believed that "[t]he difference between the amount of work performed in designated waters by U.S. pilots and GLPA pilots [was] minimal." *Id.* Plaintiffs do not explain how this response was in any way inadequate or unsupported by the evidence. Indeed, in their brief, Plaintiffs do not even acknowledge the Coast Guard's response. Thus, the Court cannot conclude that the Coast Guard's response to Plaintiff's comment provides a basis to overturn the Coast Guard's judgment.[11]

Plaintiffs' next argument, however, has merit. Plaintiffs argue that the Coast Guard's adoption of the ten-percent adjustment to pilot compensation violated the APA because it was not the result of reasoned decision-making. In the NPRM, the Coast Guard specifically invited the public to address "whether the 10% adjustment figure [was] appropriate for the 2016 rate." 80 Fed. Reg. at 54,498. Perhaps not surprisingly, commenters from the pilotage associations

---

[11] Plaintiffs also noted in their comment that Canadian GLPA pilots are government employees and "Canada has its own unique social programs, tax regime, and currency." Pl.'s Reply at 27; A.R. 319. Plaintiffs cannot seriously contend, however, that the Coast Guard did not adequately address the concern that Canadian pilots were government employees. Indeed, the entire reason the Coast Guard implemented a ten-percent upward adjustment was precisely *because* Canadian pilots were government employees. Plaintiffs made no attempt to explain why that fact alone made them entirely unsuitable for comparison. Moreover, Plaintiffs did not attempt to explain why the fact that Canada has "unique social programs, tax regime, and currency"—in essence that Canada is a different country—makes Canadian pilots entirely unsuitable comparators when all other aspects of their employment are nearly identical to U.S. pilots. Accordingly, the Court cannot find that the Coast Guard acted arbitrarily in response to these comments.

suggested that the adjustment was not high enough while commenters from the shipping industry suggested that adjustment was too high. Pilotage associations argued that the adjustment should be somewhere between twenty-five and thirty-seven percent. A.R. at 94, 152. These commenters pointed to quantifiable factors such as cost-of-living adjustments, pension contributions, and health care costs and submitted data and analysis supporting their calculations. *See* A.R. at 93–94, 151–52. They also highlighted factors that are more difficult to quantify, such as guaranteed minimum compensation and the limited liability of Canadian pilots. *See* A.R. at 93–94. The shipping industry, on the other hand, questioned whether there was any need for an increase whatsoever after certain "comparability adjustments" were applied. A.R. at 319.

Rather than adopt the twenty-five or thirty-seven percent adjustments advocated by pilotage associations or, as the shipping industry suggested, forgoing an adjustment altogether, the Coast Guard opted for the ten-percent adjustment that it had originally proposed in the NPRM. *See* 81 Fed. Reg. at 11,915. Not only did the Coast Guard not adopt the proposals submitted by commenters, the Coast Guard did not rely on any of their data or analysis. Indeed, even though the Coast Guard noted that "[t]wo commenters provided arguments or data in support of a higher adjustment," the Coast Guard claimed that it "had not been able to validate the data or analyze the commenters' arguments within the time frame statutorily allowed for [the 2016] ratemaking." *Id*. Thus, the Coast Guard's decision for a ten-percent adjustment apparently stood entirely on the "statements made at the 2014 GLPAC meetings" that it originally referenced in the NPRM. *Id*.

However, the GLPAC statements offered no rational basis for a ten-percent adjustment, as opposed to some higher or lower figure, and they generated no significant discussion by GLPAC members. The statements that the Coast Guard relied upon occurred during a GLPAC

meeting in which the Committee was discussing a proposal for the Coast Guard to set pilot

compensation at a minimum of $295,000.  *See* A.R. at 605.  During discussion of the proposal,

one GLPAC member stated his belief that the $295,000 figure was "a good number for the Coast

Guard to go forward with" and an unidentified speaker interjected that the figure was "the

Canadian rate times 10 percent."  *See* A.R. at 605.  Another member chimed in claiming that the

$295,000 figure was "not the high side of where we can argue on numbers."  A.R. at 605.  He

noted that the figure was "not far out of line with the Canadians' rate or compensation,"

especially when one considered the number of additional responsibilities that the Americans had

that the Canadians did not.[12]  A.R. at 605.  Thus, the member believed that it was "well

justifiable to be 10 percent higher."  A.R. at 605.  Despite this discussion, no one ever explained

the provenance of this ten-percent figure.  Indeed, no one explained what factors it was taking

into account or what data it was relying upon.  Nor did the GLPAC ever put this ten-percent

adjustment issue to a vote.[13]  *See* A.R. at 605.  Nevertheless, the Coast Guard inexplicably

claimed that this adjustment was based "on the best data available," despite no data being cited

anywhere.  81 Fed. Reg. at 11,915.

Faced with this record, the Coast Guard now argues that it felt that neither the pilotage

associations nor the shipping industries comments were convincing and therefore it "decided to

leave the ten percent adjustment intact."  Coast Guard's Mot. at 24.  Essentially, the Coast Guard

argues that it was invoking the wisdom of King Solomon by promulgating a compromise

number—however, unlike the Coast Guard, "King Solomon was not subject to the

---

[12] The GLPAC member did not specify the additional responsibilities to which he was referring.  *See* A.R. 605

[13] Indeed, even the proposal that they did put to a vote concerning the $295,000 base compensation figure failed.  *See* A.R. 605.

Administrative Procedure Act." *Settling Devotional Claimants v. Copyright Royalty*, 797 F.3d 1106, 1109 (D.C. Cir. 2015). Rate setting is of course not "an exact science" and perfection is not "mandatory." *Ass'n of Am. Publishers, Inc. v. Governors of U. S. Postal Serv.*, 485 F.2d 768, 773 (D.C. Cir. 1973). But, the Coast Guard is obligated to make reasoned decisions supported by the written record before it. *See* 17 U.S.C. § 803(c)(3). It does not do so when it selects a figure that is entirely detached from any data or analysis, but merely happens to fall within a range of figures proposed by commenters.

Admittedly, the D.C. Circuit has permitted agencies in some instances to "split the difference" when presented with imperfect evidence in rate-setting and other analogous contexts. *See United Parcel Serv., Inc v. U.S. Postal Serv.*, 184 F.3d 827, 840 (D.C. Cir. 1999) ("Admittedly, the choice of the one-percent figure (as opposed to some other point between 0.18% and 7.85%) is somewhat mysterious, but the general path is clear enough . . . Although with more time the Commission might have been able to get better information . . . a 'judgmental approach' selecting a figure between these two estimates, though favoring the low end of the spectrum, was within the Commission's authority." (internal citation omitted)); *National Cable Television Ass'n, Inc. v. Copyright Royalty Tribunal*, 724 F.2d 176, 187 (D.C. Cir. 1983) (declining to "label the Tribunal's determination lawless or the product of caprice" when it "could not mathematically derive its ultimate decision [and] [i]nevitably, it used its expert judgment to make a 'best guess'" by "split[ing] the difference."); *Ass'n. of Am. Publishers, Inc. v. Governors of U. S. Postal Serv.*, 485 F.2d 768, 773 (D.C. Cir. 1973) ("[T]he rough splitting of a difference between two fairly but not wholly satisfactory rate calculations is a familiar permissible technique."). But "in those cases, the administrative body relied on *some* relevant and creditable methodological evidence, even if it was 'far from perfect' or 'fairly but not wholly

satisfactory.'" *Settling Devotional Claimants*, 797 F.3d at 1121 (quoting *National Cable Television Ass'n, Inc.*, 724 F.2d at 184 & *Assoc. of Am. Publishers, Inc.*, 485 F.2d at 773) (emphasis in original, internal citations omitted).  Absent even that minimal foundation, a court cannot countenance such a rough-justice approach to ratemaking.  *See id.*

Here, the Coast Guard gave no rational explanation for its adoption of a ten-percent increase to pilotage rates.  The Coast Guard relied on a figure that was merely mentioned with approval by one or two people at a GLPAC meeting without any attempt to explain a factual basis for that number.  Indeed, there is no evidence that the Coast Guard or its sources at the GLPAC ever relied on any relevant or creditable methodological evidence whatsoever in arriving at this figure.  And even though commenters supplied data that the Coast Guard might theoretically have marshalled to support their decision, the Coast Guard admitted that it did not meaningfully engage or analyze either the data or the arguments, *see* 81 Fed. Reg. at 11,915, and therefore it cannot now rely on them as a basis for its decision, *see EchoStar Satellite L.L.C. v. FCC*, 457 F.3d 31, 36 (D.C. Cir. 2006) (disregarding agency's argument because, "[t]hough some broadcasters made th[e] argument before the Commission, the agency never adopted it").  In short, the Coast Guard arrived at the ten-percent adjustment without engaging in reasoned decisionmaking, and therefore its decision was arbitrary and capricious in violation of the APA.

## C.  Challenges Based on Features Not Included in the Coast Guard's Rate-Setting Methodology

Finally, Plaintiffs argue that the Coast Guard acted arbitrarily and capriciously when it failed to include two features in its methodology, despite their presentation in comments.  First, Plaintiffs argue that because pilotage associations derive a significant amount of additional revenue based on the size of the ships that they service, the Coast Guard's failure to include any

consideration of this factor in its revenue projections was arbitrary and capricious. Second, Plaintiffs argue that actual revenue collections rarely if ever match the revenue amounts that the Coast Guard projects for a given season, meaning that the pilotage associations either over-collect—to the detriment of shippers—or under-collect—disadvantaging pilotage associations. Yet, according to Plaintiffs, the Coast Guard refused to include a mechanism to adjust future rates based on the over-collection or under-collection by the pilotage associations in past years.

1.  Consideration of Revenues Based on Vessel Size – "Weighting Factors"

Fees collected by pilotage associations are largely based on three numbers that are multiplied together: (1) the base hourly pilotage rate established by the Coast Guard, (2) the hours that the registered pilot is on the bridge or available to the master of the vessel, and (3) a weighting factor. It is this third element, the weighting factor, that Plaintiffs argue the Coast Guard's rate-setting methodology neglected to account for when projecting revenues for upcoming shipping seasons. A weighting factor is a value ranging from 1.0 to 1.45 that corresponds with the size of a given vessel based on its length, breadth, and depth. Larger vessels yield higher weighting factors, which therefore result in greater pilotage fees for a given voyage. Plaintiffs argue that the Coast Guard acted arbitrarily and capriciously when it "[(1)] failed to account for a relevant factor (the weighting factor), [(2)] failed to properly address Plaintiffs' comments regarding the weighting factor, and [(3)] failed to articulate why it chose to disregard the weighting factor even though it had considered the weighting factor previously." Pls.' Mot. at 13.

*a. Mootness*

Before reaching the merits of Plaintiffs' claims, the Court must first consider the effect that the Coast Guard's final rule for 2017 pilotage rates has, if any, on these proceedings. On

August 31, 2017, the Coast Guard published its final rule setting pilotage rates for the 2017 shipping season. *See* 82 Fed. Reg. at 41466. As part of that rule, the Coast Guard updated the ratemaking methodology to now "incorporate the income generated from weighting factors" and pledged to use those factors to set rates in the future. *See id.* Defendants argue that the issuance of this final rule necessarily moots the weighting factor issue for purposes of this action. *See* Defs.'s Notice Final Rule, ECF No. 30. Plaintiffs disagree. They argue that "[n]othing in the 2017 Rule remedies either the legal infirmities of the 2016 ratemaking proceeding or the overcharges resulting from inflated pilotage rates over the past seventeen months." Pls.'s Opp'n Suggestion of Mootness, ECF No. 31.

Article III of the United States Constitution grants the Judiciary authority only to adjudicate "Cases" and "Controversies." U.S. Const. Art. III. As a result, plaintiffs who bring suit in federal court must demonstrate that a case or controversy exists by showing that they have suffered "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright*, 468 U.S. 737, 751 (1984). An "actual controversy" must exist not only "at the time the complaint is filed," but throughout "all stages" of the litigation. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009) (internal quotation marks omitted); *see also Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) ("To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed' " (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, (1975))). "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481 (1982)) (per curiam). To demonstrate that an issue

is moot, a party must show "that (1) 'there is no reasonable expectation that the alleged violation will recur,' and (2) 'interim relief or events have completely or irrevocably eradicated the effects of the alleged violation.'" *Nat'l Black Police Ass'n. v. Dist. of Columbia*, 108 F.3d 346, 349 (D.C. Cir. 1997) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).

The thrust of Plaintiffs' argument is that the Coast Guard's inclusion of weighting factors in its 2017 rate-making methodology does not eradiacte the effects of the 2016 rule. But, "[t]he determination whether sufficient effects [of the alleged violation] remain to justify decision often will turn on the availability of meaningful relief." 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3533.3.1, at 104-05 (3d ed. 2008). On the one hand, "a case is not moot if a court can provide an effective remedy." *Larsen v. U.S. Navy*, 525 F.3d 1, 4 (D.C. Cir. 2008). At the same time, courts may not decide a controversy where post-filing events "make[ ] it impossible for the court to grant 'any effectual relief whatever' . . . ." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992); *see also Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (case rendered moot "when, among other things, the court can provide no effective remedy because a party has already 'obtained all the relief that [it has] sought' ") (quoting *Monzillo v. Biller*, 735 F.2d 1456, 1459 (D.C. Cir. 1984)); *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1207 (D.C. Cir. 1996) (a party "no longer suffer[s] a legally cognizable injury traceable to the alleged violations" where "the court can no longer provide . . . any meaningful relief"). Accordingly, whether this issue is moot will necessarily turn on the availability of a remedy in this case. As discussed *infra*, the Court is not prepared at this point to decide the complex issue of redressability based on the current state of the record and the briefing. Accordingly, the Court

will reserve judgment on the issue of mootness and order the parties to submit supplemental briefs addressing the matter.

### b. Merits

In the event that the Court concludes the issue is not moot, the Court would find that the Coast Guard's actions with respect to weighting factors were arbitrary and capricious. During the notice-and-comment period, Plaintiffs observed that the proposed rule sought to set pilotage rates that would achieve "a target revenue figure given the expected demand in the upcoming year." A.R. at 293. But, as Plaintiffs pointed out, actual pilotage association revenues were not just a function of pilotage rates and demand (i.e. the amount of shipping traffic in a given season). *See* A.R. at 293–94. Indeed, they argued that fees based on vessel size, as measured by weighting factors, represented a non-trivial portion of the revenue realized by pilotage associations. *See* A.R. at 294. However, because the Coast Guard's proposed rate-setting methodology failed to account for these additional revenues, the rate-setting calculation would necessarily result in higher pilotage rates than necessary to achieve the pilotage associations' revenue targets. *See* A.R. at 294. Applying these higher rates, pilotage associations would realize revenue far in excess of their revenue targets. *See* A.R. at 294. Commenters argued, for example, that if the average weighting factor was 1.25 and the Coast Guard accurately predicted demand, under the proposed methodology, pilotage associations would realize revenue that was twenty-five percent higher than the target they were trying to achieve. This result was not far-fetched given that, according to the commenters, the average weighting factor for all vessel traffic in the 2014 shipping season was 1.28. Thus, commenters urged that the Coast Guard's rate-setting methodology "must consider the effect of the weighting factor on anticipated revenues when setting rates." A.R. at 295.

In response, the Coast Guard stated that it saw "potential merit in the suggestion that [its] ratemaking take weighting factors into account" and noted that the Coast Guard would "take it under advisement." 81 Fed. Reg. at 11,923. Ultimately, however, it declined to incorporate any weighting factors adjustment into its 2016 methodology. The Coast Guard explained simply that, "[g]iven the high variability from year to year in the numbers and types of vessels requiring pilotage, [it] ha[s] never considered weighting factors in projecting revenue projections of the rate." *Id.* (emphasis added). Notably, the Coast Guard did not claim that this variability prevented it from making a weighting factor projection or from accounting for revenues derived from weighting factors in any way.

In their motion, Plaintiffs argue, consistent with their comments, that the "weighting factor constitute[d] too important a variable to simply ignore" because "[t]he weighting factor, by formula, increases pilot revenue, and even if the average weighting factor varies from year to year . . . , at least some allowance for the weighting factor must be made to impart accuracy to revenue projections and actual collections." Pls.' Mot. at 15. According to Plaintiffs, the Coast Guard's "failure to consider the weighting factor constitutes exactly the type of failure to consider a relevant factor that courts routinely hold violative of the APA." Pls.' Mot. at 15. Defendants respond most prominently by arguing that, even though weighting factors will actually result in greater revenue for pilotage associations, the Coast Guard did not include those factors in their projections because, based on its experience, "actual revenue and projected revenue rarely match." Coast Guard's Mot. at 15. As evidence, Defendants point to a supposed $20 million revenue gap between projected revenues and actual revenues realized by the pilotage associations between 2005 and 2014. Thus, according to the Coast Guard, it decided to "take this comment under advisement to see if the new methodology with its several changes [would]

correct this historic pattern." Coast Guard's Mot. at 16. The Pilots put a finer point on this argument. According to the Pilots, the Coast Guard declined to use the weighting factors in its analysis because it believed that doing so would continue to "result in undercompensation of the pilots." Pilot's Mot. at 19–20.

Although Defendants may wish for these to have been the arguments advanced by the Coast Guard in response to the commenters' observations, they were not. When reviewing agency action under the APA, this Court may only rely upon the reasons given by the agency, rather than "counsel's *post hoc* rationalizations for agency action." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself"); *see also SEC v. Chenery*, 318 U.S. 80, 95 (1943) ("[A]n administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained."); *EchoStar Satellite L.L.C.*, 457 F.3d at 36 (disregarding agency's argument because, "[t]hough some broadcasters made th[e] argument before the Commission, the agency never adopted it"); *Chamber of Commerce of U.S. v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005). Here, the only argument that the Coast Guard advanced in its final rule was that it had "never [previously] considered weighting factors in projecting revenue" due to "the high variability from year to year in the numbers and types of vessels requiring pilotage." 81 Fed. Reg. at 11,923. Thus, Defendants' new argument that the Coast Guard feared that the inclusion of weighting factors might continue to undercompensate pilotage associations must be disregarded for purposes of this Court's APA review.[14]

---

[14] In any event, this argument is unpersuasive. While it is true that there is evidence in the record suggesting that there have been revenue short-falls during some years in the past, *see* A.R. 1192, the record does not reveal what these shortfalls amounted to in the aggregate or that

In truth, the Coast Guard simply failed to consider the impact that weighting factors might have on projected revenue calculations. The Coast Guard has stated that, in revising the pilotage rate-setting methodology, its goal was to "align[] projected revenues with the actual association collections." 82 Fed. Reg. at 41,467. At the time the Coast Guard decided to revise the pilotage rate-setting methodology, it was aware that pilotage associations generated some amount of revenue based on weighting factors. Yet, when commenters pointed out that the proposed methodology's revenue projections failed to account for weighting-factor revenue, the Coast Guard declined to even consider the issue. Indeed, the Coast Guard simply pledged to "take the matter under advisement," even though it also saw "potential merit" in the commenters' suggestion. But reasoned decisionmaking requires giving present consideration to important aspects of problems—not merely promising to consider those matters at some point *in the future*.

Instead of considering whether the inclusion of weighting factor revenue in the rate-setting methodology was appropriate, the Coast Guard simply explained why it had not *historically* considered weighting factors. But that commentary does not adequately explain why the *new* rate-setting methodology should not account for those factors. First, the mere fact that the Coast Guard had not previously accounted for weighting factors is not in and of itself reason

_____

there was any persistent trend as of 2014. Defendants cite an analysis performed by the Coast Guard's Director of Great Lakes Pilotage suggesting that there was a $20 million shortfall between 2005 and 2014. But neither that analysis nor any data supposedly relied upon in that analysis can be found anywhere in the administrative record. "Where, as here, an agency's determination is based upon a complex mix of controversial and uncommented upon data and calculations, there is no APA precedent allowing an agency to cherry-pick a study on which it has chosen to rely in part." *Am. Radio Relay League, Inc. v. FCC*, 524 F.3d 227, 237 (D.C. Cir. 2008) (internal quotations omitted). Moreover, the Coast Guard gives no reason why it would expect shortfalls to continue despite the fact that it was revising rate-setting methodologies in several important respects.

for not doing so now.  Indeed, part of the Coast Guard's reasoning for modifying the rate-setting

methodology in the first place was because the prior methodology was "distort[ed]."  80 Fed.

Reg. at 54,484.  Thus, the Coast Guard cannot rationally suggest it is correcting prior distortions

in the rate-setting methodology while at the same time ignoring a factor that would admittedly

make the calculation more analogous to actual revenue collections.  Second, even if there is, as

the Coast Guard claims, "high variability from year to year in the numbers and types of vessels

requiring pilotage," the Coast Guard did not insist that these figures could not be estimated, that

it lacked any necessary data to make those projections, or any other reason that the variability of

ships forecloses consideration of weighting-factor revenue.  Thus, it is hard to understand how

this variability, standing alone, necessarily leads to the conclusion that weighting factor revenues

should not be accounted for.  Indeed, just a year later, the Coast Guard revised its rate-setting

methodology to specifically include this weighting-factor revenue in its methodology.  *See* 82

Fed. Reg. at 41,466.

In short, the Coast Guard's failure to even consider the propriety of including weighting

factor revenue in its rate setting methodology was arbitrary and capricious because it represented

"an important aspect of" the revenue streams that it was attempting to estimate.

## 2.  "Truing Up" or Refund Mechanism

Finally, the Court considers the Plaintiffs' arguments concerning the need for a

mechanism to adjust—or "true up"—future rates based on the differences between projected and

actual revenue in past years.  During the Notice and Comment period, Plaintiffs argued that:

> [a] major defect in the NPRM and in the overall administration of these statutory
> authorities by the [Coast Guard] is that these authorities have not been adequately
> deployed to ensure rate payers that the rate-setting process is using reliable data either for
> past periods or as a basis of projected pilot revenue requirements.  In most government
> rate-setting environments, rate payers can expect that the regulated utilities are subject to
> a uniform system of accounting, that the regulated entities' financial submissions are

routinely audited and verified by the rate-setting body, that the rate-setting agency maintains accurate, current operational data to enable past periods to be checked against projections for those periods, and a 'truing up' or refund mechanism to compensate rate payers when disparities between projections and actual data for a given period yield excess revenue collections. These features do not exist in the current system administered by [the Coast Guard], despite considerable statutory power available to [the Coast Guard] to impose these mechanisms.

A.R. at 284–85. The Coast Guard responded, stating that it believed it had "provided extensive evidence in support of [its] analysis of association expenses and revenues." A.R. at 1350. Specifically, it explained that "the associations follow uniform reporting procedures and use the reporting software [it] provide[s]." A.R. at 1350. It also noted that independent accounting firms audit expenses and revenues and financial information is posted on the Coast Guard website, and that the Coast Guard used the most recent audited data to analyze the impact of its Final Rule. The Coast Guard concedes, however, that it did not mention or respond to the portion of the comment concerning the 'truing up' or refund mechanisms. Plaintiffs have zeroed in on this omission and claim that it now provides a basis to overturn the Coast Guard's judgment. *See* Pl.'s Mot. at 21.

Under 5 U.S.C. § 553(c), it is certainly incumbent upon the Coast Guard to "respond [ ] in a reasoned manner to significant comments received." *U.S. Satellite Broad. Co., Inc. v. FCC*, 740 F.2d 1177, 1188 (D.C. Cir. 1984); *see also, e.g., Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35–36 & n.58 (D.C. Cir. 1977). But it "has never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments, no matter how insubstantial." *See, e.g., Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984). The "dialogue" between administrative agencies and the public is intended to be "a two-way street." *Home Box Office*, 567 F.2d at 35. "Just as the opportunity to comment is meaningless unless the agency responds to significant points raised by the public, so too is the agency's opportunity to respond to those comments meaningless unless the interested party clearly states

its position." *Northside Sanitary Landfill, Inc. v. Thomas*, 849 F.2d 1516, 1520 (D.C. Cir. 1988) (internal citations and quotation marks omitted). Thus, "comments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results [the agency reaches]." *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 394 (D.C. Cir. 1973).

In this case, Plaintiffs' comments about a "truing up" or refund mechanism does not meet this threshold. In the nearly forty-page comment submitted by Plaintiffs, the issue of these adjustments appears in exactly one sentence. And, even in that sentence, the central thrust of it is devoted to the reliability of the Coast Guard's data, not the implementation of truing up mechanisms. Based on this comment, it is far from clear that Plaintiffs are suggesting the implementation of any system. Rather, they simply suggest that "truing up" mechanisms exist in other rate-setting environments (though they cite no support for that contention) and note that such mechanisms do not exist in the Coast Guard's methodology for setting pilotage rates. Plaintiffs, however, offer no explanation whatsoever as to why the absence of such a mechanism is significant or why the Coast Guard should otherwise adopt one. Under such circumstances, the Court cannot find that the Coast Guard's failure to respond to this comment was either arbitrary or capricious. As the Supreme Court aptly observed, "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more, to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'" *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553–54 (1978); *see also WildEarth Guardians v.*

*Jewell*, 738 F.3d 298, 310 (D.C. Cir. 2013) (noting that "the last-ditch, kitchen-sink nature of [plaintiff]'s suggestions bears on the extent to which the [agency] was required to address them" when plaintiff protested the agency's failure to "consider a list of alternative ideas that [plaintiff] submitted in a single paragraph" in its comment).

Curiously, Plaintiffs also complain that, in setting rates for 2016, the Coast Guard deviated from a supposed policy when it did *not* reduce pilotage rates based on the surplus revenues collected by the pilotage associations in 2014. *See* Pls.' Mot. at 20. Plaintiffs argue that this was a violation of the APA because, when an agency changes policy, "it must provide reasoned explanation for its action, which would ordinarily demand that it display awareness that it is changing position." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (internal quotation marks omitted). The Court must point out, however, that this argument is in direct tension with the comment that the Plaintiffs submitted during the rule making. As noted above, Plaintiffs suggested that the Coast Guard's methodology *did not* contain a "truing up" mechanism, but now they argue that the Coast Guard had an entire "practice" of making just such adjustments. The Court fails to understand how plaintiffs reconcile these conflicting positions. Nonetheless, Plaintiffs had it right the first time—the Coast Guard had never established a policy of making these adjustments. Thus, there was no APA violation.

Plaintiffs argue that the Coast Guard should have, according its purported policy or practice, reduced the 2016 pilotage rates based on excess revenue collections in 2014. But, for their argument, Plaintiffs do not point to any instance in which the Coast Guard had previously reduced rates based on prior over-collections. Instead, they rely on a single ten-percent, *upward* adjustment in pilotage rates that the Coast Guard imposed in 2015. That adjustment, however, does not support Plaintiffs' position.

When the Coast Guard went about setting rates for the 2015 shipping season, it found that application of its former rate-setting methodology would result in "rates across the Great Lakes [that would], on average . . . decrease by approximately 12 percent from the 2014 rates." Great Lakes Pilotage Rates—2015 Annual Review and Adjustment, 80 Fed. Reg. 10,365, 10,380–81 (Feb. 26, 2015). The Coast Guard found that this decrease, however, was "not due to increased efficiencies in pilotage services but rather a result of adjustments to [the union] contract data" that the Coast Guard used to estimate pilot compensation. *Id.* at 10,380–81. The Coast Guard declined to impose this decrease because recently completed independent audits had revealed that, in the prior season, there was a significant gap between projected revenues and those actually collected by pilotage associations. Accordingly, the Coast Guard believed that "[i]mplementing a rate decrease would further widen this disparity . . . ." *Id.* at 10,381. The Coast Guard was particularly concerned that further decreasing rates would "adversely impact the provision of safe, efficient, and reliable pilotage service on the Great Lakes," which it considered to be "integral to the public interest." *Id.* Thus, to "begin aligning actual and projected revenues," the Coast Guard, in its discretion, increased pilotage rates by ten-percent. *Id.* at 10,368. Although the Coast Guard did not "propose a solution" for the broader methodological issue in the ratemaking process, it assured stakeholders that it was "working to develop new proposals to address the significant hindrances of the [old] methodology." *Id.*

This one-time adjustment to rates does not support the Plaintiffs' position for several reasons. First, contrary to Plaintiffs' intimations, there is nothing in the 2015 ratemaking that suggested that the Coast Guard was either starting or continuing any policy of always adjusting future rates based on over-collections or under-collections in past years. Rather, it simply represents a single judgment to increase rates based on an *ad hoc* examination of relevant facts,

as it was permitted to do under the rate-making regulations.  To the extent that such adjustments were needed, they were only needed before the Coast Guard modified its methodology.  Indeed, as the Coast Guard explained, its adjustment to the 2015 rates was simply an attempt to overcome the "hindrances" of its prior methodology.  *Id.* at 10,368.  But, by 2016, it had modified the rate-setting methodology and believed that both it and the 2016 "rate increases support[ed] safe, efficient and reliable pilotage."  81 Fed. Reg. at 11,923.

Even if the Coast Guard's actions in 2015 could be construed as establishing a new policy, the policy is not as broad as Plaintiffs would suggest.  The Coast Guard did not adjust rates merely because there was a discrepancy in the prior year between the revenues it had projected and the revenues that the pilotage associations had collected.  Rather, it increased rates because it believed that the continuation of low pilotage rates represented a serious threat to the safe, efficient, and reliable pilotage on the Great Lakes.  Thus, to the extent that the Coast Guard espoused any policy, it was a policy of increasing rates when those public interests were threatened.  In this case, Plaintiffs are not arguing that the Coast Guard should have increased rates, it is arguing that the Coast Guard should have *lowered* rates, but they make no argument that such an adjustment was needed to preserve safe, efficient, and reliable pilotage.  Accordingly, the Court finds that the Coast Guard's failure to adjust 2016 pilotage rates based on revenue surpluses in 2014 was not an unexplained deviation from past policy, and thus it was not arbitrary and capricious.[15]

---

[15] Plaintiffs also make a seemingly related argument concerning the data that the Coast Guard relied upon in setting the 2016 pilotage rates.  Plaintiffs argue that the Coast Guard failed to rely on actual 2014 revenue figures in its rate-making, despite the availability of those figures.  *See* Pl.'s Reply at 15–16.  This non-reliance, however, is really no surprise given that revenues for prior years are *not* inputs in the rate-making calculation.  To the extent that this is just another way of saying that the Coast Guard *should* have considered these revenues and adjusted rates

### D.  Remedy

In total, the Court has found the Coast Guard has acted arbitrarily and capriciously in two respects.  First, it failed to engage in reasoned decisionmaking when it imposed a 10% increase on the benchmark compensation for pilots because the amount of that increase was not supported by any analysis.  Second, the Coast Guard failed to consider an important factor when it refused to consider the impact that weighting factor revenue would have on its rate-making calculations. The typical remedy for arbitrary and capricious agency action is to vacate the rule.  *Am. Bioscience, Inc.* 269 F.3d at 1084.  In deciding whether to provide the typical remedy, the Court should consider the seriousness of the deficiencies and any potentially disruptive consequences of vacatur.  *See Heartland Regional Med. Center v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009).  However, in addition to the typical remedy, Plaintiffs also request that "the Court instruct the Coast Guard to complete remand proceedings promptly and make whole the ratepayers who have been burdened by the arbitrary Final Rule crediting in the calculation of future rates excessive 2016 pilotage fees paid by the ratepayers."  At this time, however, the Court is not inclined to decide the issue of remedy without additional briefing from the parties now that the issues in the cross-motions have been resolved.

---

downward to "true up rates," the Court has already found that the Coast Guard's action in this regard was not arbitrary and capricious.

## V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Plaintiffs' motion for summary judgment and grant in part and deny in part Defendants' motions for summary judgment. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: November 3, 2017                                    RUDOLPH CONTRERAS
                                                          United States District Judge