# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN GREAT LAKES PORTS ASSOCIATION, *et al.*, | : <br> : <br> : |
| Plaintiffs, | : <br> : |
| v. | Civil Action No.:  16-1019 (RC) <br> : <br> : |
| ADMIRAL PAUL F. ZUKUNFT, *Commandant, United States Coast Guard, et al.*, | : <br> : <br> : <br> : |
| Defendants. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

In 2016, the Coast Guard promulgated new rules for calculating the rates that international shippers must pay American maritime pilots on the waters of the Great Lakes. Throughout the notice-and-comment process, Plaintiffs—representatives of the international shipping community—criticized the proposed rules on a variety of grounds. After having their comments largely rejected, the shippers sued the Coast Guard in this Court under the Administrative Procedure Act, 5 U.S.C. §§ 500 *et seq*. In this Court's most recent opinion, the Court ruled that the Coast Guard acted arbitrarily and capriciously in two ways, but reserved its judgment on the issue of the appropriate remedy to be applied in this case. After having now received supplemental briefing, the Court now decides the issue. For the reasons stated below, the Court finds that the appropriate remedy is to remand this matter to the Coast Guard without vacating the 2016 Rule.

## II. BACKGROUND

This Court previously gave a detailed description of the facts at issue in this case in its prior Memorandum Opinion, *Am. Great Lakes Ports. Ass'n. v Zukunft,* —F. Supp. 3d—, 2017 WL 5128999 (D.D.C. Nov. 3, 2017). In short, this matter concerns the methodology that the Coast Guard promulgated in 2016 for calculating rates that international shippers must pay to maritime pilots on the waters of the Great Lakes. Plaintiffs filed suit in this Court challenging the Coast Guard's rate-setting method on a variety of grounds under the Administrative Procedure Act ("APA"). The Court closely examined each of those arguments and found two to be of merit.

The first concerned how the Coast Guard went about estimating one of the methodology's inputs—target pilot compensation. Under the revised methodology, the Coast Guard relied on compensation data for certain Canadian pilots as a benchmark, given the highly analogous nature of the work that they performed and the conditions under which they performed it. However, the Coast Guard felt that some amount of adjustment was needed in order to reflect the fact that, unlike U.S. pilots, Canadian pilots were government employees. The Coast Guard eventually decided to set target pilot compensation equal to the Canadian pilot compensation plus an upward adjustment of ten percent. However, the Coast Guard gave no rational explanation justifying the level of adjustment and it did not appear that the ten-percent figure was based on any rigorous analysis or considered judgment. Rather, it appeared that the number was merely mentioned at some point during a meeting of the Great Lakes Pilotage Advisory Committee. Consequently, the Court found that the Coast Guard's decision to adjust the benchmark compensation by ten percent typified arbitrary and capricious decisionmaking and therefore violated the APA. To be clear though, the Court did not find that the decision to make

an adjustment was arbitrary and capricious, it found only that the number ultimately selected by the Coast Guard was unsupported by any rational decisionmaking.

The Plaintiffs' second meritorious argument concerned the Coast Guard's failure to consider revenue obtained from so-called "weighting factors." In setting pilotage rates, the Coast Guard seeks to set hourly pilotage rates that will be sufficient to cover the expenses of the pilotage associations and also provide them with a modest rate of return. During the notice-and-comment period, Plaintiffs observed that the proposed rule sought to set pilotage rates that would achieve "a target revenue figure given the expected demand in the upcoming year." Administrative Record ("A.R.") at 293, ECF No. 27-2. But, as Plaintiffs pointed out, actual pilotage association revenues were not just a function of pilotage rates and demand (i.e. the amount of shipping traffic in a given season). *See* A.R. at 293–94. Indeed, they argued that fees based on vessel size, which is measured using "weighting factors," represented a non-trivial portion of the revenue realized by pilotage associations. *See* A.R. at 294. However, because the Coast Guard's proposed rate-setting methodology failed to account for these additional revenues, Plaintiffs argued that the rate-setting calculation would necessarily result in higher pilotage rates than necessary to achieve the pilotage associations' revenue targets. *See* A.R. at 294. Thus, commenters urged that the Coast Guard's rate-setting methodology "must consider the effect of the weighting factor on anticipated revenues when setting rates." A.R. at 295. Despite the pleas from commenters, the Coast Guard did not consider the effects of weighting factors in its methodology. The Court concluded that the Coast Guard's failure to consider the propriety of including weighting factor revenue in its rate setting methodology was arbitrary and capricious.

Although the Court found the Coast Guard's 2016 Rule was deficient in the two respects described above, the Court did not resolve what the appropriate remedy should be in this matter.

Instead, the Court instructed the parties to provide supplemental briefing addressing the appropriate remedy in this case. The parties have now fully briefed this final issue.

### III. ANALYSIS

Plaintiffs argue that they are entitled to myriad forms of relief. First, Plaintiffs urge the Court to vacate the 2016 Rule in its entirety. Pls.' Suppl. Br. at 14–16, ECF No. 36. They then request relief that is both retrospective and prospective in nature. Retrospectively, Plaintiffs argue that they are entitled to relief that addresses the "burdensome effects on vessel owners (ratepayers) of the unlawful rates established by the 2016 Final Rule." Pls.' Suppl. Br. at 17. Specifically, they request that the Court order that the Coast Guard calculate the "overcharges" that Plaintiffs paid in the 2016 season by undertaking a "simple arithmetic exercise" and then order the Coast Guard to "re-rate" invoices for the 2016 season, which would effectively entitle ship owners to a refund. Pls.' Suppl. Br. at 18–20. Alternatively, Plaintiffs suggest that the Court could require the Coast Guard to credit ship owners for those same "overcharges" in the next shipping season. Pls.' Suppl. Br. at 19. Plaintiffs also request that the Court order reimbursements for "overcharges" that have already occurred in the 2017 shipping season, given that the 2017 rate setting relied on the same ten-percent adjustment to benchmark compensation as the 2016 season. Pls.' Suppl. Br. at 22. On the prospective side of things, Plaintiffs ask the Court to (1) enjoin the pilotage associations from invoicing pilotage services at the rates set forth in the 2017 Final Rule, (2) direct the Coast Guard to recalculate the rates in the 2017 Final Rule "by performing the purely arithmetic exercise of removing the 10 percent increase in the benchmark pilot compensation and determining the rates that result," and (3) instruct the Coast Guard and the Pilotage Associations only to charge for pilotage services based on the recalculated rates for the remainder of the 2017 shipping season. Pls.' Suppl. Br. at 21–22.

The Court must note that many of Plaintiffs' requests demonstrate that they fundamentally misunderstand this Court's prior ruling. Indeed, Plaintiffs' requested relief implies that the Coast Guard erred by making any upward adjustment to benchmark compensation or by not including weighting factors into its methodology. That is not what this Court held. Rather, this Court's prior holding stands only for the proposition that the Coast Guard failed to *justify* these decisions. For example, on the ten-percent adjustment issue, while it is possible that the adjustment amount was set too high, it could also be the case that the adjustment was too low, or it could even be true that the adjustment amount was correctly decided. That issue, however, is not for the Court to decide. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) ("The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency," rather the court is to determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168, 83 (1962))). Consequently, the remedy for this failure is not, as the Plaintiffs suggest, a "purely arithmetic exercise" whereby the error can be corrected by simply removing the ten percent adjustment from the Coast Guard's methodology and recalculating rates. Instead, the typical remedy for these types of APA violations is to vacate the offending provision and to remand to the agency for proceedings consistent with the court's order. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001). Thus, to the extent that Plaintiffs urge the Court to simply order the Coast Guard to set new 2016 and 2017 rates using certain basic arithmetic, that the Court cannot do.

Under ordinary circumstances, the APA directs courts to "hold unlawful and set aside agency action" whenever the action is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts in this Circuit, however, have long held that "[a]n inadequately supported rule [] need not necessarily be vacated." *Allied-Signal, Inc. v. U.S. Nuclear Reg. Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993) (internal citations omitted). "The decision whether to vacate depends on [1] 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and [2] the disruptive consequences of an interim change that may itself be changed.'" *Id.* at 150–51 (quoting *Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990)). The Court examines each of these factors in turn.

There is at least some reason to believe that the errors in the 2016 Rule were substantial. On the ten-percent adjustment issue, the Court simply has no basis to know whether the Coast Guard chose correctly or incorrectly. On the one hand, the Coast Guard did provide a cogent explanation for why an upward adjustment to the benchmark compensation was necessary for purposes of the calculation, but the Coast Guard did not offer any reason to believe that ten-percent was necessarily the right figure. And commenters in the 2016 and 2017 ratemaking cycles provided both arguments and data supporting both higher and lower adjustments. Consequently, this Court is not convinced that the Coast Guard would be unable to support its ten-percent figure, but the Court also cannot be sure that the Coast Guard would necessarily come out the same way if it was forced to reexamine the issue. "But the Court's uncertainty on that point merely highlights the magnitude of the procedural violation." *Shands Jacksonville Med. Ctr. v Burwell*, 139 F. Supp. 3d 240, 268 (D.D.C. 2015) (finding error in rulemaking "substantial" where the Secretary never "provide[d] a reasoned justification of her position").

Because the Court has been given no assurance that the Coast Guard chose correctly, the Court cannot find that the Coast Guard met its burden to show that the flaw in the rule was not serious. *See id.* ("To the extent the Secretary bears the burden of demonstrating that the 'normal remedy' of vacatur does not apply, . . . she has failed to show that the flaw in the rule was not serious" (quoting *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1110 (D.C. Cir. 2014))). And there is even greater reason to doubt the Coast Guard's decision on the issue of weighting factors, given that the Coast Guard admittedly saw "potential merit" in the commenters' suggestions and then, just one year later, incorporated weighting factors into its rate-setting methodology. Thus, the Court cannot conclude that the defects in the Coast Guard's 2016 Rule were not serious.

But the seriousness of the defects does not end this Court's inquiry. The Court must also consider the "disruptive consequences of an interim change that may itself be changed." "When a court vacates an agency's rules, the vacatur restores the status quo before the invalid rule took effect and the agency must initiate another rulemaking proceeding if it would seek to confront the problem anew." *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) (internal citation and quotation marks omitted). That is, the offending rule is rendered void and of no effect and there is a "reinstat[ement] [of] the rules previously in force." *Action on Smoking & Health v. C.A.B.*, 713 F.2d 795, 797 (D.C. Cir. 1983).

In this case, vacatur would mean that the rates previously declared for the 2016 shipping season would be set aside and the 2015 rates, which were lower than those in 2016, would be deemed operative for the entirety of that shipping season. Shipping companies and pilotage associations would, after vacatur, find that every payment that was made in the 2016 season was erroneous. Moreover, it would appear that the Coast Guard would be unable to reinstate the 2016 rates through a properly justified new rule due to the presumption against retroactive

7

rulemaking.[1] *See Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208–09 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms" and, "[e]ven where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant."). While there seems to be some dispute over whether and to what extent the pilotage associations might be required to issue refunds under those circumstances, to the extent that they would be required to do so, the disruptive consequences are clear.[2] Indeed, the D.C. Circuit has recognized as much in cases that are very much analogous to the circumstances presented here. *See Allied–Signal*, 988 F.2d at 151 ("the consequences [of vacatur] may be quite disruptive" because "the Commission would need to refund . . . fees collected . . . [and] it evidently would be unable to recover those fees under a later-enacted rule."); *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 198 (D.C. Cir. 2009) (holding that second *Allied–Signal* factor weighed against vacatur because vacating the rule "would have required HHS to make payments to those

---

[1] The Coast Guard's statutory rate-making authority is governed by 46 U.S.C. § 9303(f). It provides in relevant part that the Coast Guard "shall prescribe by regulation rates and charges for pilotage services, giving consideration to the public interest and the costs of providing the services." *Id.* Plaintiffs make no attempt to argue that the language in this statute or any other authorizes the Coast Guard to retroactively set pilotage rates. The Court's own review yields no basis upon which to find the Coast Guard is so authorized.

[2] Even if the pilotage associations would not be required to issue refunds, remand without vacatur is the appropriate remedy when the status quo ante cannot be restored. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 756 (D.C. Cir. 2002) (holding that remand without vacatur was appropriate when there was "no apparent way to restore the status quo ante" where "the Secretary here has already disbursed the 1999 program moneys to numerous dairy producers throughout the country, and those moneys may not be recoverable three years later"); *Sugar Cane Growers Co-op of Fla. V. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (holding that remand without vacatur was appropriate because "[t]he egg has been scrambled and there is no apparent way to restore the status quo ante" where the Secretary had improperly disbursed large quantities of sugar to farmers across the country, who in turn had already plowed under their crops.)

hospitals for [certain] years [in which the rule was in effect] and for any subsequent years until the agency repromulgated the same rule and gave an adequate reason for rejecting the alternatives," but "[r]einstating the same rule [] likely would not have enabled HHS to recover payments made [in those years] through the time of reinstatement" because of the rule against retroactive rulemaking).  Because "remand with vacatur would, in effect, dictate a substantive outcome based on a procedural error . . . the disruptive consequences would be considerable." *Shands Jacksonville Med. Ctr.*, 139 F. Supp. 3d at 270.

Having found that the first *Allied–Signal* factor favors vacatur and the second factor counsels against vacatur, the Court must weigh these competing considerations.  "There is no rule requiring either the proponent or opponent of vacatur to prevail on both factors," rather "resolution of the question turns on the Court's assessment of the overall equities and practicality of the alternatives." *Id.* (internal citations omitted).  While the Court does find that the deficiencies identified in the 2016 Rule were significant, the Court cannot conclude that they were so substantial as to warrant the considerable disruption that vacatur would likely invite.  Rather, the Court finds that the appropriate remedy is to remand the matter to the Coast Guard and for the Coast Guard to evaluate and justify an appropriate adjustment to benchmark compensation for its ratemaking methodology going forward.[3]

---

[3] In the Court's prior decision, the Court also noted that there was a question about whether the weighting-factor issue had become moot given that the Coast Guard had issued a rule in 2017 that incorporated weighting factors into its rate-setting methodology. *See Great Lakes Pilotage Rates—2017 Annual Review*, 82 Fed. Reg. 41,466, 41,466 (Aug. 31, 2017). Ordinarily, such action is enough to moot an APA issue. *See e.g.*, *Worth v. Jackson*, 451 F.3d 854, 861 (D.C. Cir. 2006).  However, in some circumstances, when there is a possibility to recoup payments made under a prior rule, courts have found that the promulgation of the new rule may not necessarily eradicate the effects of the old rule and thus may not moot the issue. *See Cape Cod Hosp. v. Sebelius*, 630 F.3d 203, 210 (D.C. Cir. 2011) ("a live controversy remain[ed] regarding the [plaintiffs'] objection to [a] 2007 rule" concerning Medicare payments despite agency's 2008 adjustment "to reverse the effect of the 2007" rule because "the 2008 rule

9

## IV. CONCLUSION

For the foregoing reasons the Court concludes that this matter should be remanded to the Coast Guard without vacating the 2016 Rule. An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated: March 15, 2018                                                       RUDOLPH CONTRERAS
                                                                                  United States District Judge

---

in no way compensated for any underpayments that might have been made in 2007."). There is probably good reason to believe that this line of reasoning may be applicable to the weighting-factors issue. Nevertheless, whether the weighting-factors issue is moot or not, it has no real practical impact on the outcome of this case. At the very least, there is a live issue with respect to the ten-percent adjustment to benchmark compensation. Indeed, in 2017 the Coast Guard noted that it "continue[d] to believe that the benchmark established in the 2016 final rule, based on Canadian pilot salaries plus a 10 percent differential to calculate the value of certain benefits, [was] an appropriate level of compensation." 82 Fed. Reg. at 41,481. Thus, some remedy is appropriate in this case. Because the Court finds that the appropriate remedy is to remand without vacating the 2016 Rule, whether the weighting-factors issue is moot or not makes no practical difference in the outcome here.